| | | | |
|---|---|---|---|
| IN RE: | ) | | |
| | ) | CHAPTER: | 7 |
| ANGELIA NICHOLE SHOCKLEY. | ) | CASE NO.: | 19-00138 |
| Debtor. | ) | JUDGE: | HARRISON |
| | ) | | |
| JASON BRUBACHER, with derivative | ) | | |
| standing on behalf of the bankruptcy estate, | ) | ADV. PROC. | 2:20-ap-90020 |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| AMERICAN BANK & TRUST OF THE | ) | | |
| CUMBERLANDS | ) | | |
| | ) | | |
| Defendant. | ) | | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff, Jason Brubacher, with derivative standing on behalf of the bankruptcy estate of Debtor Angelia Nichole Shockley ("Mr. Brubacher"), by and through counsel and pursuant to Fed. R. Bankr. P. 7056 and LBR 7056-1, respectfully submits this memorandum of law in support of his *Motion for Summary Judgment* filed in this adversary proceeding against American Bank & Trust of the Cumberlands ("ABT"). Mr. Brubacher hereby incorporates by reference his statement of undisputed material facts filed contemporaneously herewith, and further states as follows:

### INTRODUCTION

This is an adversary proceeding to avoid a lien held by ABT on certain real property owned by the Debtor's bankruptcy estate or, alternatively, to obtain a monetary judgment against ABT equal to the value of the lien. The basis of this requested relief is that ABT is a subsequent transferee of fraudulently transferred property with knowledge of the underlying transfer's

voidability and without good faith. The statutory basis for this relief is 11 U.S.C. §§ 542, 544, 548, and 550, as well as Tenn. Code Ann. §§ 66-3-305, 306, and 308.

As set forth herein, there is no genuine dispute of fact that (a) Debtor Angelia Nichole Shockley (the "Debtor") engaged in an actually and constructively fraudulent transfer when she deeded unencumbered property worth approximately $400,000.00 to her then fiancé, Randal Risher ("Mr. Risher") for no consideration in the months prior to filing bankruptcy while owing substantial sums to her creditors, and (b) immediately thereafter, ABT issued a loan to Mr. Risher and took a deed of trust against the property without good faith and with actual and/or inquiry notice of the fraudulent nature of the transfer thereto. Pursuant to applicable law, the Court should either (a) avoid the lien of ABT and order the liquidation of the unencumbered property for the benefit of the estate, or (b) award judgment against ABT and in favor of the estate in an amount equal to the value of such lien.

<h2 style="text-align:center">FACTUAL AND PROCEDURAL BACKGROUND[1]</h2>

Mr. Brubacher is the former husband of Debtor. [Statement of Undisputed Material Facts ("SUMF"), ¶ 1]. Prior to their divorce in 2016, the two lived together at the real property located at 2088 Buffalo Valley Road, Cookeville, Tennessee (the "Property"). [*Id.*].

On May 23, 2016, Mr. Brubacher and the Debtor were divorced pursuant to a *Final Decree* of the Chancery Court for Putnam County, Tennessee (the "Divorce Decree"), which incorporated the *Marital Dissolution Agreement* attached thereto (the "MDA") that set forth the respective responsibilities of Mr. Brubacher and the Debtor to one another incident to their divorce. [*Id.* at ¶ 2]. Under the MDA, the parties agreed that any income tax liability in tax year 2015 or thereafter arising from the operation of Lyfe Tea, LLC or JanPact, LLC—certain companies that the Debtor

---

[1] Mr. Brubacher set forth the pertinent undisputed facts in this case in his contemporaneously filed *Statement of Undisputed Material Facts and Exhibits in Support of Motion for Summary Judgment.* For ease of reference of the Court, however, he provides a summary of these facts here.

and Mr. Brubacher owned and operated prior to their divorce—would be paid by the Debtor, with the Debtor indemnifying Mr. Brubacher for any liability he incurred as a result of these debts. [*Id.* at ¶ 3].

As of January 10, 2019, the Debtor owed the IRS $332,504.60, plus an additional $42,615.12 in interest, for tax year 2015, and $32,560.22, plus an additional $1,236.01 in interest for Tax Year 2017. [*Id.* at ¶ 4]. The Debtor was aware in May 2017 of the liability that she owed to the Internal Revenue Service and to Mr. Brubacher under the MDA as incorporated into the Divorce Decree. [*Id.* at ¶ 5].

On January 9, 2018, as required by the Divorce Decree, Mr. Brubacher conveyed his interest in the Property to the Debtor. [*Id.* at ¶ 6]. The Property was unencumbered at the time of such transfer. [*Id.*]. Less than two months later, the Debtor met Randal Risher, and sometime thereafter, the two became romantically involved, eventually becoming engaged in September 2018. [*Id.* at ¶ 7].

Sometime in 2018, the Debtor attempted to take out a loan against the Property with U.S. Bank, but she was denied due to her debt. [*Id.* at ¶ 8]. After being denied this loan, the Debtor and Mr. Risher decided that it would be easier to obtain a loan if the Property were first transferred to Mr. Risher, who could then apply for a loan. [*Id.* at ¶ 9]. To effect this plan, on August 16, 2018, the Debtor conveyed the Property to Mr. Risher for no consideration. [*Id.* at ¶ 10].

In or around August 2018, Mr. Risher decided to seek a mortgage against the Property with ABT, with Mr. Risher serving as the borrower. [*Id.* at ¶ 12]. The reason for selecting ABT is that other lenders required Mr. Risher to have owned the Property for at least six months before issuing a mortgage thereon, but ABT did not have any such requirement. [*Id.*].

On September 12, 2018, Mr. Risher submitted a *Loan Application* with ABT. [*Id.* at ¶ 13]. In the Loan Application, Mr. Risher acknowledged he had owned the Property for ".25 years,"

though in fact he had owned the Property for less than one month at that time. [*Id.* at ¶ 14]. The loan officer assigned to the file was Trevor Dyer, a personal acquaintance of Mr. Risher who had known him since childhood. [*Id.* at ¶¶ 15-16].

Sometime after Mr. Risher submitted the Loan Application, he and Mr. Dyer had a conversation about the contemplated loan. [*Id.* at ¶ 17]. In this conversation, Mr. Risher explained to Mr. Dyer that the reason the Debtor transferred the Property to him prior to him pursuing the loan was because the Debtor could not qualify for a loan due to her credit issues resulting from her divorce. [*Id.*].

After Mr. Risher submitted the Loan Application, the Debtor communicated directly with Mr. Dyer related to the loan as follows:

   a. On September 5, 2018, the Debtor emailed Mr. Dyer the 2016 and 2017 tax returns for Lyfe Tea, LLC, signing the email "Angelia Brubacher." [*Id.* at ¶ 19(a)].

   b. On September 19, 2018, the Debtor emailed Mr. Dyer certain pay stubs of Mr. Risher. [*Id.* at ¶ 19(b)].

   c. On October 9, 2018, the Debtor emailed Mr. Dyer proof of Mr. Risher's ongoing child support payments and separately requested an update on the anticipated date of ABT's appraisal of the Property and closing of the loan. [*Id.* at ¶ 19(c)].

On November 8, 2018, Rooker Appraisal Service appraised the Property for ABT as part of ABT's loan underwriting process (the "Appraisal"). [*Id.* at ¶ 20]. According to the Appraisal, the Property was worth $398,700.00. [*Id.* at ¶ 21]. The Appraisal specifically acknowledged that the Property had been conveyed to Mr. Risher in August 2018 for no monetary consideration. [*Id.* at ¶ 22]. To support this statement, the Appraisal included a copy of the August 16, 2018 deed conveying the Property from the Debtor to Mr. Risher. [*Id.*]. The Appraisal also included a tax record showing that as of November 2018, the most recent property tax payments on the Property were paid by Mr. Brubacher. [*Id.*].

After receiving the Appraisal, ABT completed an internal assessment of the Appraisal (the "Appraisal Assessment"). [*Id.* at ¶ 23]. In the Appraisal Assessment, ABT included a copy of the 2018 property tax records indicating that the owner of the Property as of January 1, 2018 was Jason Brubacher and the Debtor, as husband and wife, with the Debtor as the current owner. [*Id.*]. Mr. Dyer personally reviewed both the Appraisal and the Appraisal Assessment when conducting his due diligence on the loan for ABT. [*Id.* at ¶ 24].

Sometime after Mr. Risher submitted the Loan Application, Mr. Dyer prepared a *Real Estate Loan Input Worksheet* related to ABT's underwriting of the loan (the "Loan Input"). [*Id.* at ¶ 25]. In the Loan Input, Mr. Dyer included a "Summary of Credit History" for Mr. Risher, stating therein, among other things:

    a. Mr. Risher is a new customer of ABT. [*Id.* at ¶ 26(a)].

    b. Mr. Dyer has known Mr. Risher for many years. [*Id.* at ¶ 26(b)].

    c. Mr. Risher had recently moved back to Cookeville, TN to accept a job with Lyfe Tea, LLC, a company owned by his fiancé, the Debtor. [*Id.* at ¶ 26(c)].

    d. Mr. Risher had credit issues, including (i) a bankruptcy filing; (ii) a vehicle repossession; (iii) unpaid bills as reflected on his credit report; and (iv) child support obligations. [*Id.* at ¶ 26(d)].

Notwithstanding these issues, Mr. Dyer recommended that management sign off on final loan approval. [*Id.* at ¶ 27].

ABT follows certain policies and procedures related to loan underwriting as set forth in ABT's *Loan Policy Manual* (the "Policy Manual"). [*Id.* at ¶ 28]. The Policy Manual provides that, in all cases of loans to be secured by real estate,

It is the policy of this Bank to adhere to lending standards that are consistent with safe and sound banking practices. This real estate lending policy is designed to be ***in compliance with regulatory real estate lending standards***, as well as consistent with the overall scope of the Bank's lending activities. (emphasis added). [*Id.* at ¶ 29].

Though ABT applies different underwriting criteria for loans to be sold to Fannie Mae or other Government Sponsored Entities and loans to be held by ABT in portfolio, it applies the same standards in either case to the quality of title to the property to be held as collateral therefor. [*Id.* at ¶ 30]. ABT does not perform any specific due diligence related to the title of its real estate collateral. [*Id.* at ¶ 31]. Instead, ABT relies on issuance of a title policy. [*Id.*]. Thus, if a title policy is issued, ABT does not conduct any further diligence into whether its mortgage loan is subject to avoidance under applicable law. [*Id.*]. In this case, ABT did not make any inquiry into the Debtor's assets or liabilities at the time she conveyed the Property to Mr. Risher throughout the loan application process. [*Id.* at ¶ 32].

On November 20, 2018, ABT closed on the loan to Mr. Risher. [*Id.* at ¶ 33]. ABT loaned Mr. Risher $175,000.00 (the "Loan"), which was secured by a first position lien on the Property as evidenced by the deed of trust attached to ABT's claim filed in this case (the "ABT Lien"). [*Id.*]. On January 10, 2019 (the "Petition Date"), less than two months after ABT acquired the ABT Lien, the Debtor filed this bankruptcy case. [*Id.* at ¶ 34]. In the Debtor's Statements and Schedules, the Debtor stated under penalty of perjury that as of the Petition Date, she had assets of $10,750.00 and liabilities of $919,671.00, with liabilities of more than $600,000.00 to the Internal Revenue Service and Mr. Brubacher pursuant to the Divorce Decree. [*Id.* at ¶ 35].

On April 17, 2019, this Court entered the *Order Granting Motion for Derivative Standing to Pursue Avoidance Actions* (the "Derivative Standing Order"). [*Id.* at ¶ 36]. In the Derivative Standing Order, the Court granted derivative standing to Mr. Brubacher to pursue, without limitation, all claims and causes of action that the Debtor's bankruptcy estate may have related to the Property. [*Id.*].

On June 6, 2019, Mr. Brubacher, acting derivatively on behalf of the Debtor's bankruptcy estate, filed an adversary proceeding against the Debtor and Mr. Risher, Case No. 2:19-ap-90110

(the "Risher Adversary Proceeding") seeking a declaration that the transfer of the Property from the Debtor to Mr. Risher for no consideration was both actually and constructively fraudulent pursuant to 11 U.S.C. §§ 544, 548, and 550, and Tenn. Code Ann. §§ 66-5-305, 306, and 308. [*Id.* at ¶ 37].

On January 24, 2020, this Court entered the *Order Granting Default Judgment Against Angelia Nichole Shockley and Randal Risher* (the "Risher Judgment"). [*Id.* at ¶ 38]. In the Risher Judgment, this Court (a) entered a monetary judgment against the Debtor and Mr. Risher for $400,000.00, plus pre- and post-judgment interest, and (b) ordered that the title to the Property be divested from Mr. Risher and revested into the Debtor's bankruptcy estate for administration thereby. [*Id.*].

On February 13, 2020, Mr. Brubacher filed this action seeking to avoid the ABT Lien or otherwise obtain a judgment for the value of the ABT Lien due to ABT's status as a subsequent transferee of the fraudulently transferred Property without good faith and with knowledge of the fraudulent transfer at the time it acquired the ABT Lien. [*Id.* at ¶ 39].

## STANDARD OF REVIEW

Fed. R. Civ. P. 56, incorporated herein by Fed. R. Bankr. P. 7056, provides, in part, that: "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis of the motion and identifying those portions of the record which demonstrate the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the nonmoving

party must come forward with specific facts showing that there is a genuine issue of material fact on which the nonmoving party will bear the burden of proof at trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. If, after adequate discovery, the party bearing the burden of proof establishes uncontested facts and is entitled to relief, summary judgment is appropriate. *In re Callender*, 212 B.R. 276, 279 (Bankr. W.D. Mich. 1997). The primary purpose of the summary judgment procedure is to avoid unnecessary trial where no genuine issues of material fact are in dispute. *See Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986).

**LEGAL ARGUMENT**

Mr. Brubacher's legal argument is threefold.

**First**, the transfer of the Property from the Debtor to Mr. Risher was both actually and constructively fraudulent pursuant to 11 U.S.C. §§ 544, 548, and 550, and Tenn. Code Ann. §§ 66-5-305, 306, and 308.

**Second**, ABT is a subsequent transferee of an interest in the Property through its acquisition of the ABT Lien from Mr. Risher. The ABT Lien is subject to avoidance because ABT lacked good faith when it acquired the ABT Lien.

**Third**, to the extent ABT exercised good faith, it had knowledge of the voidability of the transfer of the Property from the Debtor to Mr. Risher when it obtained the ABT Lien. The ABT Lien therefore is subject to avoidance even if ABT acquired it in good faith.

## I.     The Debtor's conveyance of the Property to Mr. Risher was an actually and constructively fraudulent transfer.

As a preliminary matter, there is no genuine dispute that the Debtor's conveyance of the Property to Mr. Risher was both an actually fraudulent transfer and a constructively fraudulent transfer under applicable law.

### a. The Debtor's conveyance of the Property to Mr. Risher was actually fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A) and Tenn. Code Ann. § 66-3-305(a)(1)

11 U.S.C. § 548(a)(1)(A) provides that a trustee may avoid any transfer of an interest of the debtor in property that was made within two years before the date of the filing of the petition, if the debtor made such transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was indebted, or became indebted on or after the date that such transfer was made. Similarly, Tenn. Code Ann. § 66-3-305(a)(1) provides that a transfer made by a debtor is fraudulent to a creditor if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor. "Intent need not be shown by direct, actual evidence, but can be proved through objective indicia of fraud or 'badges of fraud.'" *In re Holcomb Health Care Services, LLC*, 329 B.R. 622, 670 (Bankr. M.D. Tenn. 2004).

Tenn. Code Ann. § 66-3-305(b) provides a non-exhaustive list of factors that a creditor may rely upon to demonstrate a debtor's actual intent to defraud his or her creditors. These factors include, but are not limited to, the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer was of substantially all the debtor's assets;

(4) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; and

(5) Whether the debtor was insolvent or became insolvent shortly after the transfer was made.

Courts sin Tennessee have applied additional factors to determine whether a debtor transfers property with an actually fraudulent intent. *Teague v. Kidd,* 2017 WL 2299059 (Tenn. Ct. App. May 25, 2017). These factors include the following:

(1) Whether the transferor is in a precarious financial condition;

(2) Whether inadequate consideration was given for the transfer;

(3) Whether a family or friendship relationship existed between the transferor and the transferee;

(4) Whether the transfer included all or substantially all of the transferor's nonexempt assets;

(5) Whether the transferor retained a life estate or other interest in the property transferred;

(6) Whether there is a lack of innocent purpose or use for the transfer.

*Id.* at *8. For purposes of determining actually fraudulent intent under 11 U.S.C. § 548(a), bankruptcy courts rely on the "badges of fraud" established under applicable state law. *In re Holcomb,* 329 B.R. at 670-71.

Here, the factors overwhelmingly support a finding of the Debtor's actual intent to defraud her creditors through her transfer of the Property to Mr. Risher in the months prior to her bankruptcy filing.

> **i. The transfer was made to an insider or to a transferee with a family or friendship relationship.**

Mr. Risher was romantically involved with the Debtor when he received the Property worth approximately $400,000.00 from the Debtor for no consideration, becoming engaged to the Debtor soon thereafter. [SUMF, ¶¶ 7, 10]. He therefore had a family or friendship relationship with the Debtor and otherwise constitutes a non-statutory "insider." *In re Tanner,* 145 B.R. 672 (Bankr. W.D. Wash. 1992) (collecting cases); *see also In re McIver,* 177 B.R. 366 (Bankr. N.D. Fla. 1995); *In re Farson,* 387 B.R. 784 (Bankr. D. Idaho 2008) (collecting cases); *In re Torpey,* 613 B.R. 898 (Bankr. E.D. Mich. 2020) (collecting cases).

### ii. The debtor retained possession or control of the property transferred after the transfer.

The Debtor was living in the Property after the transfer thereof to Mr. Risher and as of the date of her bankruptcy filing. [SUMF, ¶¶ 11, 35].

### iii. The transfer was of substantially all the debtor's assets.

The Debtor's Statements and Schedules reflect assets valued at $10,750.00 while valuing the Property at $399,800.00. [*Id.* at ¶ 35]. This value was supported by ABT's appraisal as of the date of the subject loan transaction, which valued the Property at $398,700.00. [*Id.* at ¶ 21]. This demonstrates that the transfer of the Property to Mr. Risher was, in fact, a transfer of substantially all of the Debtor's assets.

### iv. The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred.

The Debtor transferred the Property—valued at not less than $398,700.00—for no consideration. [*Id.* at ¶¶ 10, 21].

### v. The transferor was in a precarious financial condition.

The Debtor was plainly in a precarious financial condition when she gave the Property to Mr. Risher, as she had a substantial liability to the IRS and Mr. Brubacher at such time. [*Id.* at ¶¶ 5, 35].

### vi. Inadequate consideration was given for the transfer.

The Debtor received no consideration for the Property, despite the Property being worth close to $400,000.00. [*Id.* at ¶¶ 10, 21].

### vii. The transferor retained a life estate or other interest in the property transferred.

The Debtor retained a possessory interest in the Property by virtue of her continued occupancy thereof after she gave the Property to Mr. Risher. [*Id.* at ¶¶ 11, 35].

### viii.   There is a lack of innocent purpose or use for the transfer.

There is no legitimate explanation that the Debtor can provide for her conveyance of the Property to Mr. Risher.  Had she wanted to realize the equity in the Property, she could have sold it.  Instead, she simply gave the Property to her fiancé for no consideration.

For these reasons, the undisputed facts overwhelmingly demonstrate that the Debtor had the actual intent to hinder, delay, or defraud her creditors pursuant to both 11 U.S.C. § 548(a) and Tenn. Code Ann. § 66-3-305 when she conveyed the Property to Mr. Risher for no consideration.

### b.   The Debtor's conveyance of the Property to Mr. Risher was constructively fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(B) and Tenn. Code Ann. § 66-3-305(a)(2).

In addition to avoiding a transfer based on actual intent to defraud, a trustee may avoid a transfer of an interest of the debtor in property without any intent to defraud her creditors if the debtor (a) received less than reasonably equivalent value in exchange for such transfer and (b) was insolvent on the date of such transfer or became insolvent as a result of such transfer.  11 U.S.C. § 548(a)(1)(B).  Similarly, Tenn. Code Ann. § 66-3-305(a)(2) allow a creditor to avoid a transfer of a debtor in property without demonstrating a debtor's fraudulent intent if the debtor (a) did not receive reasonably equivalent value in exchange for the transfer, and (b) intended to incur, or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Here, in the event of any dispute of material fact regarding the Debtor's actually fraudulent intent, there is no dispute that the Debtor did not receive reasonably equivalent value for the Property from Mr. Risher.  The Property was, and remains, worth close to $400,000.00, and the Debtor received nothing in exchange for the conveyance.  [SUMF, ¶¶ 10, 21].  There is also no dispute that the Debtor was insolvent or became insolvent as a result of the transfer.  The Debtor's Statements and Schedules reflect that on the Petition Date, she had assets worth $10,750.00 and

liabilities of $919,671.00. [*Id.* at ¶ 35]. Even factoring in her pre-transfer ownership of the Property, the Debtor was insolvent at the time she conveyed the Property to Mr. Risher—and she was certainly made insolvent as a result of such transfer. This fact is self-evident by her bankruptcy filing. Thus, the Debtor's transfer of the Property to Mr. Risher was constructively fraudulent, and therefore avoidable, pursuant to 11 U.S.C. § 548(a)(1)(B) and Tenn. Code Ann. § 66-3-305(a)(2).

## II. The Court should avoid the ABT Lien, as ABT is an immediate transferee of Mr. Risher who acquired the ABT Lien without good faith and with knowledge of the voidability of the underlying transfer of the Property from the Debtor to Mr. Risher.

11 U.S.C. § 548 dictates the circumstances in which the prepetition transfer of a debtor's interest in property may be avoided by a trustee. 11 U.S.C. § 550 sets forth the parties that may face liability for such avoided transfer. Under this section, to the extent a transfer is avoided under Section 548, a trustee may recover, for the benefit of the estate, the property transferred or the value of such property from (1) the initial transferee of such transfer, or (2) *any immediate or mediate transferee of such initial transferee*. 11 U.S.C. § 550(a) (emphasis added). However, a trustee may not recover from a subsequent transferee if the transferee proves that it acquired its interest in the fraudulently transferred property for value, in good faith, and without knowledge of the voidability of the transfer avoided. *Id.* at § 548(b). Similarly, Tenn. Code Ann. § 66-3-309(b) provides that to the extent a transfer is voidable under the statute, a creditor may recover judgment for the value of the asset transferred against the initial transferee or any subsequent transferee other than a good-faith transferee who took for value from any subsequent transferee.

The Sixth Circuit has addressed the scope and extent of a subsequent transferee's liability. In *In re Nordic Village, Inc.,* the court explained the application of 11 U.S.C. § 550(b), stating,

> The trustee may recover from the initial transferee . . . or any immediate or mediate transferee of such initial transferee. The chain of possible liable parties is interrupted only when a transferee takes for value, in good faith and without knowledge of the voidable nature of the transfer. The requirement of "knowledge"

is satisfied if the transferee "***knew facts that would lead a reasonable person to believe that the property transferred was recoverable***."

915 F.2d 1049, 1055 (6th Cir. 1990) (overturned on other grounds) (internal citations omitted) (emphasis added). The *Nordic Village* court continued, stating,

> The language of the statute clearly places the burden on showing value, good faith, and lack of knowledge on the transferee as a defense. The way the statute is worded makes it clear that the trustee's right to recover is broad, by giving rights against not only the transferee, but also against transferees of the initial transferee. However, to prevent innocent third parties from being hurt by this broadly delineated right of recovery, the law gives them a defense if they show that they took for value, in good faith, ***and*** without knowledge of the voidability of the transfer.

*Id.* at 1055-56 (emphasis added).

Mr. Risher is the initial transferee of the Property. He acquired the Property worth approximately $400,000.00 from his then fiancé, the Debtor, for no consideration. As set forth above, this transfer from the Debtor to Mr. Risher was both actually and constructively fraudulent, and therefore is subject to avoidance under 11 U.S.C. § 550(a). In fact, this transfer was already avoided through the Risher Judgment entered in the Risher Adversary Proceeding.

ABT is also a subsequent or mediate transferee of an interest in the Property. The undisputed facts establish that ABT acquired the ABT Lien from Mr. Risher following his acquisition of the Property from the Debtor. The undisputed facts also establish that ABT did, in fact, advance Mr. Risher $175,000.00 in exchange for Mr. Risher granting ABT the ABT Lien.

The only remaining question is whether ABT acquired the ABT Lien in good faith and without knowledge of the underlying Property transfer's voidability. Here, ABT did not exercise good faith in acquiring the ABT Lien and otherwise had knowledge of the voidability of the underlying transfer of the Property from the Debtor to Mr. Risher. The Court therefore should avoid the ABT Lien pursuant to 11 U.S.C. § 550(b) and Tenn. Code Ann. § 66-3-305(a).

### a. ABT lacked good faith when it acquired the ABT Lien.

This Court should avoid the ABT Lien based on ABT's lack of good faith in acquiring the ABT Lien. In the Sixth Circuit, courts apply a subjective test of good faith, examining the "integrity, trust, and good conduct" of the subsequent transferee. *Meoli v. The Huntington National Bank,* 848 F.3d 716, 734 (6th Cir. 2017). The question, according to the court, is did the transferee ever reach the point where it could no longer legitimately cling to its belief that the property transferred was not intended to work a fraud on the initial transferor's creditors? *Id.*

Here, ABT had actual notice of the voidability of the Debtor's conveyance of the Property to Mr. Risher at the time it acquired the ABT Lien from Mr. Risher. It therefore lacks status as a good faith subsequent transferee under 11 U.S.C. § 550(b) or Tenn. Code Ann. § 66-3-309(b)(2). In his deposition, Mr. Dyer gave clear testimony regarding ABT's knowledge of the Debtor's underlying insolvency when she transferred the Property to Mr. Risher. Mr. Dyer explains that, sometime on or around September 12, 2018, he and Mr. Risher had a conversation about how and why Mr. Risher obtained the Property while paying no consideration therefor. [*Id.* at ¶ 17]. Mr. Risher explained that because of the Debtor's prior divorce and her resulting liabilities, the Debtor could not herself qualify for a loan. [*Id.*]. To avoid this issue, the Debtor simply gave the Property to Mr. Risher, and he would apply for the loan. [*Id.*].

Mr. Dyer was asked about this conversation at his deposition, at which he explained the following:

Q:     Well, what were your qualms and how were they satisfied?

A:     He had just told me that he – they felt like he would be able to obtain the loan, had a better chance of getting the loan in his name because of her recent divorce, and that was the reason that they put the property in his name, so that he could apply for the loan.

[*Id.*].  When asked why the Debtor's divorce would have impacted her ability to get a loan herself,

Mr. Dyer explained:

> A:  Generally – and I don't recall the exact conversation, but generally people's credit is affected by divorces.  We – I don't recall getting into that with him about her.  He just felt like they would have a better chance.  He did state that she did go through a divorce and she was paying alimony.

[*Id.*].  Counsel for ABT asked additional questions about this conversation at Mr. Dyer's

deposition, which led to the following exchange:

> Q:  And you said it was because she was concerned that she wouldn't be able to apply – that Ms. Shockley was concerned she wouldn't be able to qualify for the loan, correct?
>
> A:  That's correct.
>
> Q:  Do you recall whether that conversation was in person or over the phone? How did that take place?
>
> A:  With Randy?
>
> Q:  Yes.
>
> A:  Okay.  I believe it was in person.
>
> Q:  Okay.  And was that the entire extent of the conversation, that he was concerned that Ms. Shockley wouldn't be able to apply for the loan, or was there more to it?  I just want to make sure we have the full conversation.
>
> A:  I mean, it was just concerns that the results of the divorce would not enable her to obtain the loan.  You know, I think – from my observation, she just had fears that she wouldn't be able to get the loan, and she wanted it to be in his name, and that was the reason they had – he applied for it just in his name.
>
> . . .
>
> Q:  Okay.  And what did you discuss with [Ryan Smith, President of ABT] after that conversation with Randy?
>
> A:  Just the reasoning that the property was put into Randy's name; that they felt like he would be able to get the loan because of her divorce that she'd gone through prior to this loan.

[*Id.*].

The testimony is clear. Mr. Risher told ABT that the Debtor had outstanding liabilities stemming from her divorce, and that as a result, the Debtor did not believe she would be able to qualify for a loan. ABT was completely comfortable with the Debtor simply deeding the Property to Mr. Risher, her fiancé, for no consideration, then having him apply for the loan to avoid having to account for the Debtor's insolvency. ABT's knowledge of the underlying voidability of the Debtor's conveyance to Mr. Risher establishes that ABT acquired the ABT Lien without good faith. ABT therefore cannot meet its burden of proving good faith as a matter of law. The Court should avoid the ABT Lien or enter judgment against ABT for the value of the ABT Lien accordingly.

### b. ABT had knowledge of the underlying Property transfer's voidability when it acquired the ABT Lien.

To the extent the Court finds a dispute of fact regarding ABT's lack of good faith in acquiring the ABT Lien, there is no dispute that it had knowledge of the voidability of the Debtor's transfer of the Property to Mr. Risher at the time ABT acquired the ABT Lien from Mr. Risher. As set forth in *Nordic Village*, "knowledge" for purposes of 11 U.S.C. § 550(b) does not require actual knowledge, but merely that the transferee "knew facts that would lead a reasonable person to believe that the property transferred was recoverable." *Nordic Village*, 915 F.2d at 1055.

*Nordic Village* is instructive on the issue of a transferee's knowledge. In that case, a debtor's officer and shareholder drew a $26,000.00 cashier's check made payable to the IRS against the debtor's bank account to satisfy such officer's personal income tax liability. *Id.* at 1050-51. The *Nordic Village* court held that the IRS was liable for the value of the payment transferred thereto, as it was an immediate transferee with knowledge of the transfer's voidability. *Id.* In reaching this decision, the *Nordic Village* court stated,

> [T]he facts give rise to an inference of inquiry notice. The IRS is a sizeable organization and its procedures for collecting taxes complicated, but there is nothing in size or complexity that should lessen the obligation to observe circumstances giving notice that something might be wrong with accepting a check.

[*Id.*].

Because the IRS knew or reasonably should have known, based on the irregularity of the circumstances, that the payment from the debtor to its officer was actually or constructively fraudulent to the debtor's creditors, the IRS was deemed to have knowledge of the underlying transfer's voidability and therefore was liable to the debtor's estate for the value of the payment it received from such officer. *Id.*

The Sixth Circuit further developed this analysis in *Meoli v. The Huntington National Bank.* 848 F.3d 716 (6th Cir. 2017). In that case, the court reviewed *Nordic Village,* among other cases, and concluded that the proper analysis is "a holistic factual determination of whether a reasonable person, given available information, would have been alerted to a transfer's voidability." *Id.* at 733. "What a reasonable person would be alerted to depends not just on whether there was inquiry notice, but also on what investigative avenues existed, whether a reasonable person would have undertaken those avenues given the situation, and what findings the reasonable investigations would have yielded." *Id.*

Bankruptcy courts addressing this exact issue—whether a mortgagee's lien may be avoided following a transfer of its collateral from a debtor to its borrower prepetition—and have concluded that such liens should be avoided in circumstances exactly like the one before the Court. *In re Altmeyer*, 268 B.R. 349 (Bankr. W.D.N.Y. 2001); *In re Castiglione*, 2008 WL 2038839 (Bankr. D. N.J. May 9, 2008).

In *Altmeyer,* the debtor and her husband owned certain real property as tenants by the entireties. *Altmeyer*, 268 B.R. at 351. Within a year prior to filing bankruptcy, the debtor deeded

her interest in this real property to her husband for consideration of "one and no more dollars." *Id.* Thereafter, the debtor's husband obtained a mortgage on the property and received a cash payment from his mortgagee. *Id.* When the debtor filed bankruptcy, her trustee filed an adversary proceeding to avoid both (a) the debtor's prepetition conveyance of her interest in the subject property to her husband for insufficient consideration, and (b) the mortgage taken against the subject property by the debtor's husband following the conveyance. *Id.* After finding that the underlying property transfer from the debtor to her husband was a fraudulent conveyance under 11 U.S.C. § 548, the court considered whether the mortgage company was a subsequent transferee of an interest in the property with knowledge of the underlying transfer's voidability when it acquired its mortgage lien pursuant to 11 U.S.C. § 550. *Id.* at 354.

Applying Section 550 to the subsequent mortgage context, the *Altmeyer* court stated that in real estate transactions, transferees have a duty of inquiry. *Id.* Specifically, where a purchaser has knowledge of any fact sufficient to put him on inquiry as to the existence of some right or title in conflict with that he is about to purchase, he is presumed either to have made the inquiry, and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim, to be considered as a bona fide purchaser. *Id.* (internal quotations omitted).

In holding that the mortgagee had knowledge of the voidability of the underlying transfer, the court held,

> In the present instance, the deed from [the debtor] explicitly recited a price of "one and no more dollars." With insolvency, such absence of consideration is one of two pivotal requirements for avoidance of a transfer as a fraudulent conveyance. Further, as a statement within the chain of title, this recitation gives notice of an obligation to inquire about the other requisites for lien avoidance. [The mortgagee] offers not even a suggestion that it made inquiry about any of these conditions, especially the insolvency of [the debtor]. Thus, [the mortgagee] presents no issue of fact relative to the duty of good faith to inquire about outcomes that are necessarily suggested by a recitation of only nominal consideration. Without such good faith, [the mortgagee] is unable to establish a necessary element of the defense of 11 U.S.C. § 550(b)(1).

*Id.* at 355.

In re Castiglione* also dealt with this exact issue.  In that case, a debtor owned property with her husband prepetition.  *Castiglione*, 2008 WL 2038839, at *2.  Prior to filing bankruptcy, the debtor deeded her interest in this property to her husband alone, with the consideration reflected on the deed being $1.00.  *Id.*  Approximately one month prior to the debtor filing bankruptcy, her husband obtained a mortgage against the subject property for $244,699.57.  *Id.*  The debtor then filed a chapter 7 bankruptcy case.  *Id.* at *3.

After first obtaining an order avoiding the debtor's prepetition transfer of her interest in the property to her husband, the trustee filed an adversary proceeding seeking to avoid the mortgage lien obtained by the debtor's husband, arguing that the mortgagee was a subsequent transferee with knowledge of the underlying transfer's voidability.  *Id.* Citing *Altmeyer,* a New York bankruptcy case, the court found that no statutory or common law authority existed suggesting that a similar duty of inquiry would be inappropriate in similar transactions in New Jersey.  *Id.* at *5.  As such, the court avoided the mortgagee's lien for the benefit of the debtor's bankruptcy estate.  *Id.*

While *Altmeyer* and *Castiglione* applied inquiry notice standards related to title examinations under New York and New Jersey law, respectively, the same standards apply in Tennessee.  *Texas Co. v. Aycock,* 227 S.W.2d 41, 46 (Tenn. 1950) ("In our State, as far back as the case of *Woodfolk v. Blount,* 4 Tenn. 147, 151, 9 Am.Dec. 736, it was held: 'When anything appears which would put a man of ordinary prudence upon inquiry, the law presumes that such inquiry was actually made, and therefore fixes the notice upon him as to all legal consequences.'").

Tennessee bankruptcy courts have specifically applied inquiry notice under Tennessee law. *In re Thomas Homes, LLC,* 2012 WL 122539 (Bankr. E.D. Tenn. Jan 17, 2012).  In *Thomas Homes*, a trustee sought to avoid a secured claim filed against property of the estate.  *Id.* at *3.  In that case,

the debtor's owners intended to purchase property individually via warranty deed, encumber such property with a mortgage via a deed of trust, then immediately thereafter quitclaim such property to the debtor subject to the mortgage lien via a quitclaim deed, which would be accomplished by a simultaneous recording of the three documents. *Id.* However, because the quitclaim deed was recorded first, the deed of trust technically encumbered property that the debtor's owners no longer owned, as the title indicated that ownership had transferred to the debtor prior to the recording of the deed of trust. *Id.* After the debtor filed bankruptcy, the mortgagee sought a declaration that the deed of trust should encumber the transferred property notwithstanding the prior recording of the quitclaim deed. *Id.* at *6. The trustee objected, claiming that as a bona fide purchaser under 11 U.S.C. § 544(a)(3), it lacked constructive notice of the error, meaning the property could not be burdened with the deed of trust in the hands of the trustee. *Id.* at *7.

Ultimately, the court found that while the trustee lacked constructive notice, it nonetheless had inquiry notice of the encumbrance as of the petition date. *Id.* at *11. In reaching this determination, the court quoted *Blevins v. Johnson County,* 746 S.W.3d 678 (Tenn. 1988), stating,

> While it is true that recordation creates constructive notice as distinguished from actual notice, in that ordinary actual notice is when one sees with his eyes that something is done, another kind of notice occupying what amounts to a middle ground between constructive notice and actual notice is recognized as inquiry notice. . . . The words "actual notice" do not always mean in law what in meta-physical strictness they import; they more often mean knowledge of facts and circumstances sufficiently pertinent in character to enable reasonable cautions and prudent persons to investigate and ascertain as to the ultimate facts. Even a good faith failure to undertake the inquiry is no defense. Thus, whatever is sufficient to put a person upon inquiry, is notice of all the facts to which that inquiry will lead, when prosecuted with reasonable diligence and good faith.

*Id.* at *10 (quoting *Blevins,* 746 S.W.3d at 683). The court continued, stating "When anything appears which would put a man of ordinary prudence upon inquiry, the law presumes that such inquiry was actually made, and therefore fixes the notice upon him as to all legal consequences." *Id.* at *10 (quoting *Aslinger v. Price,* 2006 WL 2521566, at *5 (Tenn. Ct. App. Sept. 1. 2006)).

Thus, Tennessee state law and bankruptcy courts in Tennessee plainly adopt standards of inquiry notice with respect to issues of title and challenges to title validity.

Here, for the reasons stated above, ABT had actual notice of the underlying fraudulent transfer of the Property from the Debtor to Mr. Risher when it acquired the ABT Lien. But if a dispute of fact exists as to ABT's actual notice, ABT nonetheless had inquiry notice of the underlying issues. The following undisputed facts establish ABT's inquiry notice immediately prior to issuing the Loan and accepting the ABT Lien, either through documents provided to ABT or conversations between Mr. Risher and Mr. Dyer—the loan officer handling the Loan and a personal acquaintance of Mr. Risher:

1. ABT knew that the Debtor had acquired the Property in January 2018 from her ex-husband, Mr. Brubacher. [SUMF, ¶¶ 22-24].

2. ABT knew that the Debtor had insolvency issues following her divorce from Mr. Brubacher that would have impacted her ability to obtain a mortgage against the Property in her name. [*Id.* at ¶ 17].

3. ABT knew that the purpose of the Debtor conveying the Property to Mr. Risher was to allow the Property to serve as collateral for a loan, something that the Debtor believed would not be possible if the Debtor were to apply for the loan herself. [*Id.*].

4. ABT knew that the Debtor conveyed the Property to Mr. Risher in August 2018 for no consideration. [*Id.* at ¶¶ 22, 24].

5. ABT knew that Mr. Risher was the Debtor's fiancé. [*Id.* at ¶ 26].

6. ABT knew that the Debtor continued to live at the Property following the transfer to Mr. Risher and would remain there after Mr. Risher obtained the Loan. [*Id.* at ¶ 18].

7. The Policy Manual provides that ABT will have a lending policy "in compliance with regulatory real estate lending standards." [*Id.* at ¶ 29].

8. ABT typically follows the same title standards when underwriting a loan for sale on the secondary market to a Government Sponsored Entity as it does when it writes a portfolio loan. [*Id.* at ¶ 30].

9. Section 4301.5 of Freddie Mac's lending guidelines provide that, in the case of a cash-out refinance mortgage, which includes a mortgage placed on a property previously owned free and clear by the borrower, the borrower must have been on the title to the property for at

least six months prior to the date of issuing the loan, unless the borrower inherited the property or was legally awarded the property, subject to certain limited exceptions.

10. Section B2-1.3-03 of Fannie Mae's Selling Guide provides that in the context of a cash-out refinance, the property must have been acquired by the borrower at least six months prior to the date of issuing the loan, subject to certain limited exceptions.

11. Mr. Risher had only owned the Property for a month when he submitted the Loan Application, and he had only owned the Property for approximately three months when he gave the ABT Lien. [*Id.* at ¶¶ 22, 24]. Mr. Risher also did not fall within any of the limited exceptions provided in the Freddie Mac or Fannie Mae guidelines set forth above.

12. ABT does not conduct any diligence related to title to real property that will serve as collateral for any of its mortgage loans other than obtaining a title insurance policy. [*Id.* at ¶ 31].

13. ABT made no inquiry into the assets or liabilities of the Debtor at the time she conveyed the Property to Mr. Risher prior to acquiring the ABT Lien. [*Id.* at ¶ 32].

14. ABT had multiple instances of email correspondence regarding loan underwriting with the Debtor alone and without Mr. Risher copied thereon. [*Id.* at ¶ 19].

The pertinent facts are undisputed. ABT knew that Mr. Risher acquired the Property from the Debtor months before ABT acquired the ABT Lien. Mr. Risher told Mr. Dyer as much. Even if Mr. Risher did not expressly inform Mr. Dyer of the reasons behind the underlying transfer, the circumstantial evidence was more than sufficient to put ABT on notice of this fact. The fact that the Property was acquired by Mr. Risher from the Debtor for no consideration is alone enough to compel ABT to investigate. When ABT knew that the Debtor, believing herself to be ineligible for loan qualification resulting from the debt stemming from her divorce, deeded the $400,000 Property to Mr. Risher for no consideration one month before he applied for the Loan while continuing to live in the Property and while actively participating in the loan process, ABT should have asked additional questions. It did not do so.

Under the applicable legal standards, ABT had the requisite notice. It therefore cannot rely on the defenses set forth in 11 U.S.C. § 550(b). It is an immediate transferee of a fraudulent transferee, and it is subject to liability. Pursuant to 11 U.S.C. § 550(a), this Court should find

judgment as a matter of law in favor of Mr. Brubacher and order that either (a) the ABT Lien be avoided, or (b) ABT must pay to the Debtor's bankruptcy estate the total value of the ABT Lien.

## CONCLUSION

There is no genuine issue of fact here that precludes judgment in favor of Mr. Brubacher on all claims. First, the Debtor actually and constructively fraudulently transferred the Property to Mr. Risher pursuant to 11 U.S.C. § 548 and Tenn. Code Ann. § 66-3-305(a), Second, ABT is a subsequent or mediate transferee of an interest in the Property through its acquisition of the ABT Lien. Third, ABT lacked good faith in issuing the ABT Lien, as its own loan officer admitted to understanding the fraudulent purpose behind the transfer of the Property from the Debtor to Mr. Risher. Fourth, ABT had either actual or inquiry notice as to the underlying fraudulent transfer, yet it took no steps to investigate before acquiring the ABT Lien.

Based on the foregoing, this Court should find as a matter of law that either (a) the ABT Lien is void and must be removed from the Property, or (b) ABT is liable to Mr. Brubacher, on behalf of the Debtor's estate, for the value of the ABT Lien.


Respectfully submitted,

*/s/ Ned Hildebrand*
HENRY E. ("Ned") HILDEBRAND, IV
GRAY WALDRON
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, TN 37212
615.933.5851
ned@dhnashville.com
gray@dhnashville.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed electronically on August 14, 2020.  A copy of the same was served via email through the Court's CM/ECF system on all parties entitled to service thereby.

/s/ Ned Hildebrand
Henry E. ("Ned") Hildebrand, IV