## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COOKEVILLE DIVISION

| | |
|---|---|
| IN RE:<br><br>ANGELIA NICHOLE SHOCKLEY,<br><br>     Debtor. | Case No. 2:19-bk-00138<br>Chapter 7<br>Judge Harrison |
| JASON BRUBACHER, with derivative standing on behalf of the bankruptcy estate<br><br>     Plaintiff,<br><br>v.<br><br>AMERICAN BANK & TRUST OF THE CUMBERLANDS,<br><br>     Defendants. | Adversary No. 2:20-ap-90020 |

### AMERICAN BANK & TRUST'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, American Bank & Trust of the Cumberlands ("ABT"), Defendant in the above-styled action, and hereby responds to *Plaintiff's Motion for Summary Judgment* [Doc. 17], respectfully showing this Court as follows:

### INTRODUCTION

In his Motion for Summary Judgment, Jason Brubacher, with derivative standing on behalf of the bankruptcy estate, ("Brubacher" or the "Plaintiff") alleges "there is no genuine dispute of fact that . . . ABT issued a loan to Mr. Risher and took a deed of trust against the property without good faith and with actual and/or inquiry notice of the nature of the transfer thereto." However, there absolutely is a genuine dispute of fact that ABT took the subject lien with good faith and

1

without actual and/or inquiry notice of the nature of the transfer thereto. Accordingly, the Motion for Summary Judgment should be denied, and this case should proceed to a trial on the merits.

## **UNDISPUTED FACTS**

In addition to facts presented in the *Plaintiff's Statement Of Undisputed Material Facts And Exhibits In Support Of Motion For Summary Judgment* ("Plaintiff's SOMF")[Doc. 19][1], ABT relies on the undisputed facts set forth in *American Bank & Trust's Statement Of Undisputed Facts In Support Of Its Response In Opposition To Plaintiff's Motion For Summary Judgment* ("ABT'S SOMF"), filed contemporaneously herewith, and summarized below.

This case hinges on whether ABT took the ABT Lien (as further defined in *Plaintiff's Memorandum of Law In Support of Motion for Summary Judgment* [Doc. 18], p. 6) from Randal Risher ("Risher") in good faith and without knowledge of the voidability of the transfer. During Risher's loan application, ABT loan officer Trevor Dyer ("Dyer") had a conversation with Risher concerning the fact that Angelia Shockley ("Shockley" or "Debtor") conveyed the subject property to him for no consideration soon before Risher applied for the subject loan. ABT's SOMF, ¶ 7. Dyer was satisfied with Risher's explanation that he felt like he had a better chance of getting the loan in his name because of Shockley's recent divorce. *Id.*, ¶ 11. Dyer further determined that Risher's debt-to-income ratio and the loan-to-value contemplated by Risher's loan application supported ABT extending the loan to Risher. *Id.*, ¶ 2.

Throughout Risher's loan application, both Risher and Shockley (a/k/a Angelia Brubacher) communicated with ABT about Risher's application. *Id.*, ¶ 3. Shockley sent Dyer tax returns for LyfeTea, LLC (Risher's employer), copies of Risher's pay stubs, and copies of Risher's child

---

[1] ABT denies and disputes some of the alleged facts in Plaintiff's SOMF, as detailed in *American Bank & Trust's Response To Plaintiff's Statement Of Undisputed Material Facts And Exhibits In Support Of Motion For Summary Judgment* filed contemporaneously herewith.

support payments as part of Risher's loan application. *Id.* Shockley also followed up with Dyer about the status of the loan application. These occurrences were not unusual to ABT. *Id.*

ABT ordered a title report on the subject property to determine ownership of the property and also to identify any potential title issues. *Id.*, ¶ 4. Neither the IRS nor Brubacher recorded a lien against Shockley in the Putman County, Tennessee real property records prior to the time ABT acquired the ABT Lien. *Id.*, ¶¶ 5-6. Additionally, the Divorce Order between Shockley and the Plaintiff was not of record until 2019 – after the ABT Lien was established. *Id.* at ¶ 1.

Based on the information Dyer received during the loan application and underwriting process, he did not suspect that Risher had obtained the Property through a fraudulent transfer. *Id.* at ¶ 9.

<u>**STANDARD OF REVIEW**</u>

Fed. R. Civ. P. 56 mandates the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *In re Bennett*, 517 B.R. 95, 99–100 (Bankr. M.D. Tenn. 2014) (quoting *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir.2002).

The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *In re Bennett*, 517 B.R. 95, 100 (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The burden then shifts to the nonmoving party to produce evidence that would support a finding in its favor. *In re Bennett*, 517 B.R. 95, 100 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

3

When a movant's summary judgment motion challenges the sufficiency of an affirmative defense on which the non-movant bears the burden of proof, the movant need only demonstrate an absence of evidence supporting the defense. *Katz v. Wells (In re Wallace's Bookstores, Inc.)*, 316 B.R. 254, 263 (Bankr.E.D.Ky.2004). "[A] defendant who is faced with a summary judgment motion has the same burden as a plaintiff against whom a defendant seeks summary judgment. That burden requires that the non-moving party with the burden of proof on the issue in question produce sufficient evidence upon which a jury could return a verdict favorable to the nonmoving party." *Id.* at 363 (quoting *Lawyers Title Ins. Corp. v. United Am. Bank,* 21 F.Supp.2d 785, 790 (W.D.Tenn.1998)).

*Jahn v. Genesis Merchant Partners, LP (In re U.S. Ins. Grp., LLC)*, 451 B.R. 437, 442 (Bankr. E.D. Tenn. 2011).

## ARGUMENT AND CITATION OF AUTHORITY

In his Motion for Summary Judgment, the Plaintiff presents a threefold legal argument:

**First**, the transfer of the Property from the Debtor to Mr. Risher was both actually and constructively fraudulent pursuant to 11 U.S.C. §§ 544, 548, and 550, and Tenn. Code Ann. §§ 66-5-305, 306, and 308.

**Second**, ABT is a subsequent transferee of an interest in the Property through its acquisition of the ABT Lien from Mr. Risher. The ABT Lien is subject to avoidance because ABT lacked good faith when it acquired the ABT Lien.

**Third**, to the extent ABT exercised good faith, it had knowledge of the voidability of the transfer of the Property from the Debtor to Mr. Risher when it obtained the ABT Lien. The ABT Lien therefore is subject to avoidance even if ABT acquired it in good faith.

With respect to the first argument, ABT does not dispute that the transfer of the Property from Shockley to Risher was fraudulent. However, ABT disputes the second and third arguments. Specifically, with respect to the second argument, ABT agrees it is a subsequent transferee of an interest in the Property through its acquisition of the ABT Lien from Mr. Risher; however, ABT disputes the ABT Lien is subject to avoidance because ABT lacked good faith when it acquired

4

the ABT Lien. ABT has set forth evidence of its good faith in acquiring the ABT Lien, and therefore there is a genuine issue of material fact that should be heard at a trial on the merits of this case.

With respect to the Plaintiff's third argument, ABT did not have knowledge of the voidability of the transfer of the Property from the Debtor to Mr. Risher when it obtained the ABT Lien. ABT investigated the transfer from Shockley to Risher pursuant to all available investigates means that a reasonable person would have undertaken given the circumstances, and ABT could not have known that Shockley was insolvent based upon the facts presented to it during Risher's loan application.

## I.   THE MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE IS A GENUINE DISPUTE OF FACT AS TO WHETHER ABT TOOK THE ABT LIEN IN GOOD FAITH.

Sections 550(a) and (b) of the Bankruptcy Code provide:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section[s] 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
(b) *The trustee may not recover under section (a)(2) of this section from—*
(1) *a transferee that takes for value, including satisfaction securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided*; or
(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a), (b) (emphasis added).

A subsequent transferee is not liable for the transferred property if the transferee took the property: (i) "for value," (ii) "in good faith," and (iii) "without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). Tenn. Code Ann. 66-3-309(b) also provides that a

5

transfer is not voidable if the transfer was to a good-faith transferee who took for value. The Plaintiff raises no issue regarding the fact that ABT took the ABT Lien for value and admits that ABT extended $175,000.00 to Risher in exchange for the ABT Lien. *See* [Doc. 19] at ¶ 33. Thus, only "good faith" and "without knowledge of the voidability of the transfer" are at issue. These elements will be analyzed in turn.

Courts have "struggled" to define good faith in the context of fraudulent transfers. *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 734 (6th Cir. 2017) (citing *In re First Independence*, 181 F. App'x. 524, 528 (6th Cir. 2006)). In *Meoli*, the Sixth Circuit held that the following test for good faith stated by the underlying bankruptcy court was "not erroneous":

> Consequently, the question of Huntington's good faith boils down to simply this: Did Huntington ever reach the point where it could no longer legitimately cling to its belief that the Teleservices transfers were only Cyberco's collected receivables? If the answer is no [i.e., throughout, Huntington legitimately held its belief that the Teleservices transfers were Cyberco's collected receivables], then Huntington will have established its Section 550(b)(1) good faith. But, if the answer is yes [i.e., Huntington reached a point where it could not legitimately hold that belief], then it is difficult to comprehend how Huntington could have ever accepted any subsequent transfer from Teleservices without also suspecting with good reason that Teleservices was perpetrating a fraud upon its creditors.

848 F.3d at 734. Additionally, "the correct standard for good faith is a 'subjective' test probing [the transferee's] 'integrity, trust, and good conduct.'" *Id.* at 734.

In *Meoli*, the trustee sought "to recover allegedly fraudulent transfers of funds from the now-bankrupt company, Teleservices, to Huntington National Bank ("Huntington"). Huntington lent money to, and maintained the deposits of, another company called Cyberco, which had created Teleservices to perpetuate a Ponzi scheme. As part of the scheme, Cyberco and Teleservices shuttled the fraud's proceeds between their bank accounts." 848 F.3d at 719.

> Barton Watson masterminded a Ponzi scheme. As the chairman and chief executive of Cyberco, Watson represented widely that Cyberco needed money to buy more computer equipment to support its growing computer-services business. Watson also represented widely that Cyberco purchased its equipment from a company

6

called Teleservices. It was not widely known, though, that Teleservices was a paper company that Watson had created to perpetuate his fraud. Teleservices had no separate officers, directors, or employees, and it acted only through Cyberco's executives, who assumed fake names for their fake Teleservices jobs. Watson and his accomplices would fabricate Teleservices invoices that purported to document the purchase of computer equipment. Under that pretense, Watson borrowed money from several equipment financing companies and instructed them to send the money directly to Teleservices to pay for the computer equipment. Once they paid Teleservices, Watson moved the money from Teleservices's bank account to Cyberco's account at Huntington. Watson then used that money to pay his and others' salaries and to pay Cyberco's earlier debts to financing companies for previous "purchases."

*Id.* at 720.

Cyberco owed debt to Huntington that by 2004 totaled $16 million. *Id.* In September 2003, Cyberco deposited a check at Huntington from Teleservices for $2.3 million, which bounced. *Id.* At that time, a Huntington employee, Gail White "smell[ed] danger." *Id.* She then "discovered that, in the immediately preceding months, Cyberco had deposited a series of checks from Teleservices, all in large amounts. Nether White nor her superiors knew what Teleservices was." *Id.* at 721. Huntington employees then met with Watson to ask about Teleservices, and was told that it "was a recent addition to Cyberco's holdings, that Teleservices was not yet operational, and yet that Teleservices was already collecting Cyberco's receivables before sending them to Cyberco." *Id.* However, this explanation contradicted a prior one given by Watson, which was that "Teleservices was Cyberco's supplier of computer equipment." *Id.* Under this explanation, Cyberco should have been paying Teleservices, not the other way around. *Id.* "White and her superiors were unaware" that "Huntington's files actually recorded the previous representation." *Id.* White remained suspicious after talking to Watson, but "[o]ther Huntington employees were apparently satisfied with Watson's explanation – at least for the time being."

Despite being satisfied with the explanation, "in January 2004, Huntington asked Cyberco to find a new bank. Some Huntington employees explained that Huntington simply did not

understand Cyberco's complex business." *Id.* However, some employees such as John Kalb, one of White's superiors, remained suspicious of Cyberco and "wrote at the time that 'the red flags continue,' that there was in 'recent times . . . the heightened risk of financial misinformation (as well as fraud),' and that he hoped Huntington would not 'lose money' in the process of ending its relationship with Cyberco." *Id.* Kalb and White continued to investigate, and

> [b]y April 2004, Kalb was even more certain that there was foul play. Kalb believed that, in general, the computer services business was risky and that there was a tendency in the industry to exaggerate receivables. Kalb also knew that Cyberco had previously overspent its deposits and that Huntington had covered the excess spending by extending Cyberco's loan to offset the overdraft. Finally, Kalb knew that Cyberco never gave audited financial statements to Huntington, even though the loan agreement required Cyberco to do so. Cyberco just kept promising that it would give the statements as soon as the auditors signed off on sales and mergers of Cyberco's subsidiaries.

> Also around April 2004, White found proof of Cyberco's foul play. White had accessed Cyberco's receivables aging report, which is a standard accounting report that lists unpaid customer invoices. Cyberco had claimed in that report that its customers included many companies in the Fortune 500—companies that would never object to sending their checks to a lockbox. [Cyberco had previously told Huntington that its customers refused to use a lockbox.] Furthermore, Cyberco listed companies like Electronic Data Systems as customers, even though such companies were also in the computer services business and were Cyberco's competitors, not customers.

> Kalb and White contacted Huntington's security department. Larry Rodriguez, Huntington's regional head of security, [who] found out that the FBI was investigating Cyberco. Rodriguez also learned that Watson had a fraudulent past: Watson had been permanently blacklisted by the National Association of Securities Dealers; he had confessed to a bank fraud in Michigan and another fraud in California; and he had served three years in jail for a fraud-related crime. Rodriguez relayed that information to the FBI. But he did not share the information with Kalb or White. According to Kalb, Kalb asked Rodriguez about Rodriguez's findings, and Rodriguez was reluctant to share them.

*Id.* at 721-22.

Huntington defended the case on the assertion that it was a good faith transferee without knowledge of the voidability of the transfer. With respect to the "good faith" element, the bankruptcy court held that Huntington did have good faith, but only until April 30, 2004, when

8

"Huntington's investigator discovered Watson's fraudulent past, but failed to disclose that past to Huntington's manager who oversaw the bank's relationship with Cyberco." *Id.* at 729. The Sixth Circuit affirmed this conclusion. *Id.* at 730. In other words, despite Huntington's serious questions about Cyberco and Teleservices between September 2003 and April 2004, it was not until Rodriguez definitively learned of Watson's fraudulent past on April 30, 2004, that it "could no longer legitimately cling to its belief that the Teleservices transfers were as Cyberco claimed they were] only Cyberco's collected receivables." *Id.* at 723.

Notably, in *Meoli*, the bankruptcy court had held that, despite Huntington's good faith, loan payments between September 2003 and April 2004 were recoverable as fraudulent transfers "because Huntington gained inquiry notice of Cyberco's fraud on the earlier date. The Trustee successfully argued below that the inquiry notice constituted 'knowledge of the voidability of the transfers . . . .'" *Id.* at 732. This finding was reversed by the Sixth Circuit because, as will be explained *infra*, "inquiry notice, although sometimes enough to constitute 'knowledge of the voidability of the transfer,' is not necessarily enough in every case." *Id.* at 731. While this finding was reversed, it was only to allow the lower court to conduct an inquiry under the proper standard to determine if "Huntington gained knowledge of the voidability of the transfers before April 30, 2004." *Id.* at 735. For purposes of the instant argument, the relevance is that one can have "good faith" at the same time they potentially have "knowledge of the voidability of the transfer." Indeed, they are separate elements of the Section 550(b)(1) defense.

Here, the Plaintiff fails to distinguish this point, arguing that "Mr. Dyer gave clear testimony regarding ABT's knowledge of the Debtor's underlying insolvency when she transferred the Property to Mr. Risher." [Doc. 18] at p. 15. He goes on to argue that "ABT's knowledge of the underlying voidability of the Debtor's conveyance to Mr. Risher establishes that ABT acquired

9

the ABT Lien without good faith." *Id.* at p. 17. However, as *Meoli* shows, that is not the relevant inquiry. Knowledge of the voidability is a separate and distinct factor. Instead, the question to be asked is "Did [ABT] ever reach the point where it could no longer legitimately cling to its belief that [Risher's stated reason for obtaining title to the Property was not as he claimed]?" *See Meoli*, 848 F.3d at 723. The answer to that question is unequivocally no, especially when compared to the facts of *Meoli*, in which the Sixth Circuit affirmed the Bankruptcy Court's ruling that Huntington had good faith when it accepted the transfers despite some "red flags" until the time at which a Huntington employee learned of an FBI investigation of the transferor, that the transferor had been permanently blacklisted by the National Association of Securities Dealers, that he had confessed to bank frauds in two other states, and that he had served three years in jail for a fraud-related crime.

Here, Dyer testified regarding his conversation with Risher, saying that title was transferred because

> He [Risher] had just told me that he -- they [Risher and Shockley] felt like he would be able to obtain the loan, had a better chance of getting the loan in his name because of her recent divorce, and that was the reason that they put the property in his name, so that he could apply for the loan.

ABT's SOMF, ¶ 10.

ABT was "satisfied with that reasoning." Plaintiff's SOMF, Exh. 5, [Doc. 19-5] 56:7-13. Indeed, ABT was of the belief that "generally people's credit is affected by divorces." *Id.* at 22:25-23:1. In *Meoli*, being "satisfied" with the fraudster's explanation for the suspect transfers was sufficient to show Huntington's good faith. 848 F.3d at 721 ("Other Huntington employees were apparently satisfied with Watson's explanation – at least for the time being."). Moreover, Dyer explicitly stated that he did not believe, based on the information in his possession – that the transfer from Shockley to Risher was fraudulent. *See* ABT's SOMF, ¶ 9. This Court should – and

in fact ABT contends it must, based on the binding nature of *Meoli* – come to the same conclusion and find that ABT exhibited good faith, or at least that there is sufficient evidence before the Court to allow this case to proceed to trial.[2]

To the extent that Risher's explanation could be considered a "red flag," *Meoli* counsels that even if a transferee is suspicious of the transfer (or prior transfer), its subjective good faith continues until it has definitive proof of fraudulent activity. ABT never reached the point that Huntington did in discovering the fraud, and both Dyer and his superior, Ryan Smith, testified that the extent of ABT's diligence with respect to understanding the reason for the Property conveyance was Dyer's aforementioned discussion with Risher. Plaintiff's SOMF, Exh. 5, [Doc. 19-5] 56:7-13; Smith Depo, 32:1-5. As such, ABT was never in possession of any information that disclosed any other reason for the transfer than that told to them by Risher and had no subjective belief that anything was amiss with the transfer from Shockley to Risher. Further, there is other evidence of ABT's good faith when acquiring the ABT Lien, including the fact that ABT analyzed and was satisfied with the debt-to-income and loan-to-value ratios contemplated by Risher's loan application. SOMF, ¶ 2. Under *Meoli*, there is substantial evidence that ABT exhibited good faith when it took the ABT Lien, and therefore, Plaintiff's Motion for Summary Judgment should be denied.

Even if the Plaintiff was correct in his argument that knowledge of the voidability of the transfer is relevant to the good faith argument, the Plaintiff is wrong in his assertion that "Mr. Dyer

---

[2] Since ABT contends that the undisputed material facts show good faith – and, as will be shown, lack of knowledge of the voidability of the transfer – it would be appropriate for this Court to enter summary judgment in favor of ABT even in the absence of a cross-motion for summary judgment. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (citations omitted) (court can grant summary judgment *against* the moving party); *see also Fruman v. City of Detroit*, 1 F. Supp. 2d 665, 675-75 (E.D. Mich. 1998) (collecting cases).

11

gave clear testimony regarding ABT's knowledge of the Debtor's underlying insolvency when she transferred the Property to Mr. Risher" and that this knowledge deprives ABT of good faith [Doc. 18] at p. 15. To begin with, Dyer never gave any testimony regarding "ABT's knowledge of the Debtor's underlying insolvency when she transferred the Property to Mr. Risher." This is simply an incorrect attempt to summarize Dyer's testimony. Under 11 U.S.C. § 101(32), a debtor is insolvent when their debts exceed their assets. However, ABT never gained any knowledge regarding Shockley's assets. The only information they were given about why she transferred the Property is because of her alleged lack of creditworthiness because of a divorce. However, concerns about credit after a divorce simply do not equal insolvency. In fact, Experian, one of the country's largest credit reporting bureaus, states explicitly that "[c]redit reports don't list bank account balances or assets, so those numbers don't impact credit scores." *See* https://www.experian.com/blogs/news/2012/09/17/credit-score-myths/. Thus, simply knowing that Risher believed he was more creditworthy than Shockley in no way gives ABT any knowledge of whether Shockley's available assets were greater than her debts. Furthermore, there are a range of legitimate scenarios in which one with significant assets may fall behind on bills to the detriment of their credit score, including – significantly – divorce, where an ex-spouse agrees to pay joint accounts but falls behind. This would, without question, impact the other ex-spouse's credit. Also, credit can be harmed from past late payments and therefore not be indicative of current debt levels.

Quite simply, ABT's testimony shows nothing to imply ABT exercised anything other than "integrity, trust, and good conduct" when it acquired the ABT Lien, especially when compared to the facts in *Meoli*. At the bare minimum, there is absolutely "sufficient evidence upon which a jury could return a verdict favorable to the nonmoving party" such that summary judgment to the Plaintiff must be denied. *See In re U.S. Ins. Grp., LLC*, 451 B.R. at 442 (citations omitted).

## II. THE MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE IS A GENUINE DISPUTE OF FACT AS TO WHETHER ABT TOOK THE ABT LIEN WITH KNOWLEDGE OF THE VOIDABILITY OF THE TRANSFER.

The Plaintiff next takes aim at ABT's ability to claim that it obtained its deed of trust without knowledge of the voidability of the transfer from Shockley to Risher. The Plaintiff contends that the ABT Lien should be voided because ABT either had actual knowledge that Shockley's transfer to Risher was fraudulent, or even if it did not have actual knowledge, it had inquiry notice.

With respect to knowledge of the voidability of the transfer, the Sixth Circuit has held that inquiry notice, although sometimes enough to constitute "knowledge of the voidability of the transfer," is not necessarily enough in every case. *Meoli*, 848 F.3d at 732. Prior to *Meoli*, a divided panel of the Sixth Circuit had held that, under the facts of that case, "inquiry notice" sufficed for "knowledge of the voidability." *IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.)*, 915 F.2d 1049, 1056 (6th Cir. 1990), *rev'd on other grounds, United States v. Nordic Village Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). However, in *Meoli*, the Sixth Circuit made it clear that inquiry notice is not enough to constitute knowledge of the voidability of the transfer, and held, "[t]aken together, *Nordic Village* and [*In re*] First *Independence* [181 F. App'x 524 (6th Cir. 2006)] invite a holistic review of the facts to determine whether a reasonable person would have been alerted to a transfer's voidability." *Meoli*, 848 F.3d at 732. "What a reasonable person would be alerted to depends not just on whether there was inquiry notice, but also on what investigative avenues existed, whether a reasonable person would have undertaken those avenues given the situation, and what findings the reasonable investigations would have yielded." *Id.* at 733. In *Meoli*, the Sixth Circuit summarized *Nordic Village* and *First Independence*:

> In *Nordic Village*, a divided panel of this court held that, under the facts of that case, "inquiry notice" sufficed for "knowledge of the voidability." *IRS v. Nordic*

13

*Village, Inc. (In re Nordic Village, Inc.)*, 915 F.2d 1049, 1056 (6th Cir. 1990), *rev'd on other grounds, United States v. Nordic Village Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). The transferee there was the IRS. It received a check, issued by the debtor company doing business as "Swiss Haus," delivered by an individual who was an officer of that company, and with instructions to credit the check against the outstanding tax liabilities of the delivering individual, doing business as "Josef's Hair Design." *Nordic Village*, 915 F.2d at 1050–51. Facing those facts, this court held that the IRS had "inquiry notice" of the voidability of that check, even though it was not apparent that the IRS had "actual notice." *Id.* at 1056. This court explained that "[i]t is not in an ordinary business practice for corporate entities to pay one another's taxes" and that that irregularity "is sufficient to place a reasonable person on notice that the transfer was illegitimate, and by extension, that it was voidable." *Id.* That inquiry notice of voidability sufficed for "knowledge" of voidability. *Id.*

We distinguished *Nordic Village* in *First Independence*. In *First Independence*, the checks were issued by First Independence, the bankrupt debtor, to the Baumhafts, who owned First Independence, and the Baumhafts cashed the checks into their personal accounts at Merrill Lynch. *In re First Independence*, 181 Fed.Appx. 524, 526 (6th Cir. 2006). Merrill Lynch obliged. *Id.* In finding that Merrill Lynch accepted those checks without knowledge of their voidability, this court distinguished *Nordic Village* by pointing to two factual differences. **First, there was "a range of legitimate scenarios" in which the Baumhafts could have cashed their company's checks into their personal accounts—maybe the checks were salaries, loan repayments, or distributions to shareholders**. *Id.* at 529. **Second, any inquiry into the legitimacy of the checks would have been futile, because Merrill Lynch would have nobody else other than the Baumhafts, the owners of First Independence, to ask about the legitimacy of First Independence's checks**. *Id.* at 530. We therefore concluded that, on those facts, "nothing ... would alert a reasonable person to the transfers' recoverability." *Id.*

In *First Independence*, we reasoned:

> Certainly "some facts suggest ... other facts," and "[i]f a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge." But here the facts surrounding the Baumhafts' deposits would not lead a reasonable person to believe that the transfers were voidable, even though the Baumhafts' use of corporate checks may have placed Merrill Lynch on implied notice of the transfers' illegitimacy under Michigan law.

*Meoli*, 848 F.3d at 732–33 (emphasis added).

A. <u>ABT did not have actual notice of the voidability of the transfer.</u>

Here, the Plaintiff has failed to present any arguments in line with the standard set forth in *Meoli*. Instead, he first contends that ABT had actual notice that the transfer from Shockley to Risher was fraudulent because the deed for that conveyance recited that it was for no consideration. However, it is unclear how this recital could have given ABT *actual* knowledge that the transfer was fraudulent. Simply because a transfer was for no consideration does not mean that the transfer was fraudulent. In fact, one of the cases relied upon by the Plaintiff says just that. *See Wallach v. Altmeyer (In re Altmeyer)*, 268 B.R. 349, 357 (Bankr. W.D.N.Y. 2001) ("Nominal consideration may be indicative of fraud, but it is not determinative."). Additionally, the undisputed facts do not reveal that ABT had *actual* knowledge of the fraudulent nature of the transfer from Shockley to Risher. All ABT knew was that Risher claimed the Property was conveyed to him because it was believed that he would have a better chance to qualify for a loan. Also, Dyer testified he did not have any suspicions that Risher obtained the Property through a fraudulent transfer. ABT's SOMF, ¶ 9.

Moreover, the entirety of the Plaintiff's legal argument for actual notice relies on *inquiry* notice cases. *See id.*; *Isaacson v. Castiglione (In re Castiglione)*, No, 06-1523, 2008 WL 2038839, at *5 (Bankr. D.N.J. May 9, 2008); *Smoky Mtn. Title. Inc. v. Tenn. State Bank (In re Thomas Homes, LLC)*, No. 10-3129, 2012 WL 122539 (Bankr. E.D. Tenn. Jan. 17, 2012); *Texas Co. v. Aycock*, 227 S.W.2d 41, 46 (Tenn. 1950). After discussing these cases on inquiry notice, the Plaintiff then concludes that "for the reasons stated above, ABT had actual notice of the underlying fraudulent transfer of the Property from the Debtor to Mr. Risher when it acquired the ABT Lien." [Doc. 18] at p. 22. This is incorrect and not supported by any of the undisputed facts or the Plaintiff's arguments. The statement that ABT had actual notice does not appear to be a mistake,

but it is inconsistent with the rest of the brief. The record includes ample evidence that ABT did not have actual notice of Shockley's fraudulent conveyance to Risher at the time ABT made the loan to Risher.

    B.   ABT also did not have inquiry notice of the voidability of the transfer.

In viewing the Sixth Circuit's test, the first question is whether there was inquiry notice as to the voidability of the transfer. *See Meoli*, 848 F.3d at 733. If the answer to that question is yes, then the court must then analyze "what investigative avenues existed, whether a reasonable person would have undertaken those avenues given the situation, and what findings the reasonable investigations would have yielded." *Id*. In the case at hand, ABT did not have inquiry notice, and ABT exhausted the investigate avenues that were available to it. No other investigative avenues that a reasonable person would have undertaken and that would have shown fraud were available to ABT.

The first, and perhaps overarching, argument from the Plaintiff as to why ABT had inquiry notice is because the deed from Shockley to Risher was for no consideration. However, this "fact [ ] [does not] suggest . . . other facts" such that further inquiry was required. *See First Independence*, 181 F. App'x at 529. Relying on *Altmeyer* and *Castiglione*, the Plaintiff argues that those cases are factually similar and the courts in those cases found that the mortgagee had inquiry notice of the fraudulent nature of the transfer to the borrower. *See* [Doc. 18] at p. 20. To begin with, it must be noted that both cases are of little value because, *inter alia*, both cases relied upon unique elements of state law. Neither case utilized Sixth Circuit precedent (or even precedent from the Second Circuit) regarding the "knowledge of voidability of the transfer." Because the Sixth Circuit has an established test, that is what must be used here.

16

In *Altmeyer*, a New York case, the bankruptcy court noted that New York appellate courts had "[t]wice in dicta . . . recognized the same duty to inquire from facts indicating the possibility of a fraudulent conveyance." 268 B.R. at 355. The court then relied upon the fact that Erie County, New York, where the subject property was located, had title standards issued by the Bar Association of Erie County that "define the applicable custom and practice for transactions affecting real estate." *Id.* at 356. Those standards provided that "a title objection arises from nominal consideration for any deed within ten years." *Id.* The court then noted that the mortgagee's "own closing attorney prepared the deed which conveyed title for a consideration of 'one and no more dollars'" and that he "undoubtedly recognized that such absence of consideration was indicative of a fraudulent transfer." *Id.* at 357. Because the mortgagee did not ask any more questions, and "[b]y accepting or insuring such risk, [the mortgagee] became bound to the knowledge of a potential basis for the avoidance of [the borrower's] newly acquired interest." *Id.*

The court in *Castiglione* came to the same conclusion as *Altmeyer*, but with far less analysis. The case originated in New Jersey, with a property located there, so the Erie County title standards and New York appellate cases did not apply. *See* 2008 WL 2038839, at *5. Without any analysis, the court simply concluded that "this Court is unaware of any statutory or common law authority suggesting that a similar duty of inquiry [as required in New York] would be inappropriate in transactions undertaken presently in New Jersey." *Id.*

Here, Tennessee does not have any title standards nor any known appellate case law regarding a duty of inquiry that arises when a deed is for zero or nominal consideration. More importantly, the Sixth Circuit has stated that a duty of inquiry – with respect to fraudulent transfers – does not arise where there "was a range of legitimate scenarios" under which the property could have been transferred. *See Meoli*, 848 F.3d at 732 (quoting *First Independence*, 181 F. App'x at

17

529). In our case, there also "was a range of legitimate scenarios" under which Shockley would have conveyed the Property to Risher for no consideration. First and foremost, the stated reason (creditworthiness) is a perfectly legitimate scenario. Ryan Smith from ABT testified that "[i]t's very common for a family member to deed a piece of property to another family member. That happens often." ABT'S SOMF, ¶ 8. Moreover, Shockley herself obtained title to the Property from Brubacher for no consideration as a result of their divorce – another "legitimate scenario" for property to be transferred without consideration. Plaintiff's SOMF, ¶ 6. Thus, the fact that the conveyance from Shockley to Risher was for no consideration is not sufficient to put ABT on inquiry notice of voidability.

In looking at the other supposed bases for ABT's inquiry notice, those too fail to show that ABT had such notice:

1. ABT knew that the Debtor had acquired the Property in January 2018 from her ex-husband, Mr. Brubacher. [Plaintiff's SOMF, ¶¶ 22-24].

2. ABT knew that the Debtor had insolvency issues following her divorce from Mr. Brubacher that would have impacted her ability to obtain a mortgage against the Property in her name. [*Id.* at ¶ 17].

3. ABT knew that the purpose of the Debtor conveying the Property to Mr. Risher was to allow the Property to serve as collateral for a loan, something that the Debtor believed would not be possible if the Debtor were to apply for the loan herself. [*Id.*].

4. ABT knew that the Debtor conveyed the Property to Mr. Risher in August 2018 for no consideration. [*Id.* at ¶¶ 22, 24].

5. ABT knew that Mr. Risher was the Debtor's fiancé. [*Id.* at ¶ 26].

6. ABT knew that the Debtor continued to live at the Property following the transfer to Mr. Risher and would remain there after Mr. Risher obtained the Loan. [*Id.* at ¶ 18].

7. The Policy Manual provides that ABT will have a lending policy "in compliance with regulatory real estate lending standards." [*Id.* at ¶ 29].

8. ABT typically follows the same title standards when underwriting a loan for sale on the secondary market to a Government Sponsored Entity as it does when it writes a portfolio loan. [*Id.* at ¶ 30].

9. Section 4301.5 of Freddie Mac's lending guidelines provide that, in the case of a cash-out refinance mortgage, which includes a mortgage placed on a property previously owned free and clear by the borrower, the borrower must have been on the title to the property for at 23
least six months prior to the date of issuing the loan, unless the borrower inherited the property or was legally awarded the property, subject to certain limited exceptions.

10. Section B2-1.3-03 of Fannie Mae's Selling Guide provides that in the context of a cash-out refinance, the property must have been acquired by the borrower at least six months prior to the date of issuing the loan, subject to certain limited exceptions.

11. Mr. Risher had only owned the Property for a month when he submitted the Loan Application, and he had only owned the Property for approximately three months when he gave the ABT Lien. [*Id.* at ¶¶ 22, 24]. Mr. Risher also did not fall within any of the limited exceptions provided in the Freddie Mac or Fannie Mae guidelines set forth above.

12. ABT does not conduct any diligence related to title to real property that will serve as collateral for any of its mortgage loans other than obtaining a title insurance policy. [*Id.* at ¶ 31].

13. ABT made no inquiry into the assets or liabilities of the Debtor at the time she conveyed the Property to Mr. Risher prior to acquiring the ABT Lien. [*Id.* at ¶ 32].

14. ABT had multiple instances of email correspondence regarding loan.

[Doc. 18] at pp. 22-23.

To begin with, and as further detailed in *American Bank & Trust's Response To Plaintiff's Statement Of Undisputed Material Facts And Exhibits In Support Of Motion For Summary Judgment* filed contemporaneously herewith, many of the above "facts" are simply not true. ABT did not "know that the Debtor had insolvency issues following her divorce from Mr. Brubacher . . . ." As noted, *supra*, ABT only knew that Shockley and Risher believed that Risher was more creditworthy, and credit scores do not reflect assets such that it would reveal any information about

solvency. With respect to "facts" 7, 8, 9, 10, and 11, the Freddie Mac lending guidelines regarding title to property are wholly irrelevant and inapplicable. As Ryan Smith of ABT testified, ABT does not have any similar policy in place for portfolio (in-house) loans. ABT's SOMF, ¶ 9. This particular loan was a portfolio loan, not a Freddie Mae loan. Plaintiff's SOMF, Exh. 5, [Doc. 19-5] 18:20-24. Lastly, it is not correct that "ABT does not conduct any diligence related to title to real property that will serve as collateral for any of its mortgage loans other than obtaining a title insurance policy." As has been thoroughly discussed throughout this brief and the Plaintiff's brief, ABT did ask Risher about the circumstances that led to him obtaining title to the Property. ABT also obtained a title search to reveal any issues with title. ABT's SOMF, ¶ 4. Moreover, even if ABT did not conduct any diligence, that would actually support a finding that ABT did not have knowledge of the voidability of the transfer because it would not be in possession of any information that could possible give it this knowledge.

The remainder of the "facts" do nothing to give rise to inquiry notice. Those facts are: (i) ABT knew that Brubacher conveyed the Property to Shockley; (ii) ABT knew that Shockley conveyed to Risher for no consideration; (iii) Shockley continued living at the Property and was Risher's fiancé; and, (iv) ABT communicated with Shockley about loan underwriting. ABT testified that it was "normal for a third-party non-borrower [such as Shockley] to be sending [ABT]" information during loan underwriting rather than the borrower themselves. ABT's SOMF, ¶ 3. Additionally, it was very normal to ABT for family members to be conveying property to each other. ABT's SOMF, ¶ 8. Simply, all the facts that supposedly give rise to inquiry notice fall well within a "range of legitimate scenarios" such that inquiry notice of voidability does not attach. Additionally, the Plaintiff never once attempts to explain how these "facts suggest . . . other facts" such that further inquiry was required. *See First Independence*, 181 F. App'x at 529. Instead, he

just blindly concludes that "the circumstantial evidence was more than sufficient to put ABT on notice [of the fraudulent nature of the transfer]." [Doc. 18] at p. 23. Since ABT did not have inquiry notice of the voidability of the transfer, the Plaintiff's Motion for Summary Judgment should be denied.

Under *Meoli*, even if these facts did put ABT on inquiry notice of voidability of the transfer, this Court must next analyze "what investigative avenues existed, whether a reasonable person would have undertaken those avenues given the situation, and what findings the reasonable investigations would have yielded." 868 F.3d at 716. In viewing these elements, it is important to note that, since *Meoli*, this test has never once been employed by any court (insofar as such cases are available on Westlaw), so guidance from other cases is non-existent.

1. <u>What Investigative Avenues Existed</u>

In the case at hand, Plaintiff does not set out what investigate avenues existed. Instead, he simply says "ABT should have asked additional questions" based on his allegations that "ABT knew that the Debtor, believing herself to be ineligible for loan qualification resulting from the debt stemming from her divorce, deeded the $400,000 Property to Mr. Risher for no consideration one month before he applied for the Loan while continuing to live in the Property and while actively participating in the loan process." [Doc. 18] at p. 23. The Plaintiff does not set forth what questions should have been asked or to whom. He simply states, "ABT should have asked additional questions" and further alleges that ABT did not ask any additional questions. *Id*.

According to ABT, the primary investigative avenue that existed was to communicate directly with the potential borrower, unless the borrower gives permission for ABT to speak to someone else regarding the loan application. ABT's SOMF, ¶ 11. Here, Risher gave permission to ABT for them to speak with Shockley, and nobody else. ABT's SOMF, ¶ 11. It would have been

a futile endeavor, not required by Sixth Circuit case law, to ask the fraudster to provide information to investigate a potential fraudulent transfer. Thus, without Risher affirmatively giving permission to speak to anyone else, ABT was restricted to speaking only to Shockley and Risher. However, in speaking to Risher, ABT did discuss with him the reasons for obtaining title to the Property and ABT also obtained a title search, showing no liens against the Property.

While ABT had permission to speak to Shockley, the Sixth Circuit has concluded that ABT was not required to inquire from Shockley about Shockley's debts, assets, or the reasons for the property transfer. In *First Independence*, the Sixth Circuit held that Merrill Lynch was not required to investigate the legitimacy of a transfer by asking the transferor because it "would have been obviously circular in this case because the party seeking to use the funds for his own benefit was also the only party to whom the bank could make inquiry." 181 F. App'x at 530. In other words, a transferee does not have to ask the fraudster about the circumstances of the transfer because obviously they will simply lie to effectuate the transfer.

Even if ABT had asked Risher for permission to speak to others besides Shockley, it would not have yielded any fruitful investigative avenues. The Plaintiff identifies only two debts in his motion, one owed to him pursuant to their Divorce Decree, and the other to the IRS (partially pursuant to the Divorce Decree). *See* [Doc. 19] at ¶¶ 3-4. Neither the Plaintiff nor the IRS were available investigative avenues.

As an initial matter, matters within the Divorce Order were not of public record until June 19, 2019. *See* ABT's SOMF, ¶ 1. Thus, reviewing the Divorce Order was not an available investigative avenue. Perhaps the Plaintiff thinks ABT should have asked him (Shockley's ex-husband) about her assets and liabilities, despite that at the time of the Risher Loan, the Plaintiff had recorded no lien against the Property. Additionally, contacting Brubacher – whom Shockley

22

divorced two years before the subject loan – would almost certainly yield no useful information about Shockley's assets or debts at the time of the loan.

Perhaps the Plaintiff thinks ABT should have contacted the IRS and inquired as to Shockley's tax liabilities, despite the IRS did not having a lien against the Property. ABT's SOMF, ¶ 5. However, under 26 U.S.C. § 6103, the IRS is prohibited from revealing any information about a taxpayer's returns unless the requestor falls within a specified category of the statute, which ABT does not. Notably, the IRS can reveal the amount of an outstanding tax liability to a party such as ABT, but only if it has a recorded lien, which it did not. *See* 26 U.S.C. § 6103(k)(2). Thus, contacting the IRS would yield no information whatsoever and was therefore not an available investigative avenue.

Despite the Plaintiff identifying no other debts in his motion, perhaps the Plaintiff thinks ABT should have attempted to identify if Shockley had any other creditors (perhaps from an unauthorized credit report) and then contact them to investigate her debts, and then somehow compare her liabilities to her unknown assets to determine solvency. This is, in short, akin to asking ABT to go on a wild goose chase to get a definitive picture of Shockley's assets and liabilities. While ABT could have attempted to go down this path, it would not be reasonable, as will be argued below.

2. Whether A Reasonable Person Would Have Undertaken Those Avenues Given The Situation

Plaintiff has not opined on whether a reasonable person would have contacted the unnamed person(s) to whom "ABT should have asked additional questions"; however, it is unlikely that a reasonable person would have contacted anyone given the circumstances surrounding the Risher Loan. Before going forward, it is important to view this element of the *Meoli* test through the lens that ABT is a *subsequent* transferee. ABT would not have been searching for information about

23

its borrower, but an unaffiliated third party with whom it had no banking relationship. What is reasonable to ask with respect to an initial transferee is not the same as a subsequent transferee like ABT. As the concurrence in *Meoli* noted, "transferees are not required to undertake unduly onerous investigations, and whether an investigation is unduly onerous depends on the circumstances of the case." 848 F.3d at 737 (Moore, J., concurring in part).

Even though loan officer Trevor Dyer was aware of the Plaintiff and Shockley's divorce at the time the Loan was made, the Divorce Order (which was not recorded in the Real Property Records at the time of the Loan) was silent as to the amounts Shockley owed the Plaintiff and the IRS. ABT's SOMF, ¶ 1. Even if ABT could have reviewed Divorce Decree (which was not recorded in the Real Property Records until after the Loan was made), ABT would have not known Shockley owed the Plaintiff and IRS any amount at the time of the Risher Loan. Two and a half years had passed between the time the Divorce Order was entered and the time of the Risher Loan. A reasonable person would believe that if Shockley or the IRS were not paid the unnamed amounts they were owed pursuant to the Divorce Order (which we now know was hundreds of thousands of dollars), they would have obtained and recorded liens against Shockley in the Real Property Records by November 2018. In fact, a recorded lien would have presumably been the only way ABT could have known about Shockley's IRS debt since the IRS could not have disclosed such information had ABT contacted the IRS to inquire as further explained above.

With respect to potentially contacting the Plaintiff, it is unlikely that a reasonable person would contact an ex-spouse of someone she was investigating concerning debts and assets of a former spouse, even in cases of amicable divorces. Further, it would be more logical for the Plaintiff to have obtained and recorded a lien in the Real Property Records for the money he was owed than to require a lender to contact the ex-husband of its borrower's fiancé to inquire as to his

ex-wife's solvency. In the case at hand, it would not have been reasonable for ABT to contact Shockley, the Plaintiff, or the IRS about Shockley's solvency.

Lastly, it is not reasonable to have asked ABT to go on a wide-ranging search of Shockley's other potential creditors or her assets to determine her solvency or insolvency. The facts of this case show that ABT inquired with Risher about the reason for the transfer and obtained a title search that revealed no liens against the Property in order to underwrite a residential mortgage loan of under $200,000.00. Under these facts, ABT did what was reasonable to determine the validity of the transfer, and anything more – specifically contacting a prior transferee's ex-husband, the IRS, or multiple creditors – would have been "unduly onerous." *See Meoli*, 848 F.3d at 737 (Moore, J., concurring in part). Moreover, none of this would have given ABT a clear picture of Shockley's assets, which is crucial to determining solvency. Short of getting a truthful statement from Shockley – which was highly unlikely and not required to be asked for under Sixth Circuit case law – it is nearly impossible to truly understand an individual's assets, which could be held in various companies, cash not held in accounts, offshore accounts, or chattel. As such, this Court should deny the Plaintiff's Motion for Summary Judgment and find that, at a minimum, there is a question of fact as to whether a reasonable person in ABT's position would have pursued further investigative avenues.

3.  <u>What Findings The Reasonable Investigations Would Have Yielded</u>

Further investigation by ABT would not have shown fraud. While it is now well known to everyone that Shockley owed the Plaintiff and the IRS hundreds of thousands of dollars at the time she conveyed the Property to Risher, there is no way ABT could have known that at the time of the Loan, as shown above. This is because contacting the Plaintiff or the IRS would have been unreasonable. Further, even if ABT had somehow come to know the full amount of the debts

Shockley owed to the Plaintiff and the IRS, ABT would also have to have an understanding of her assets to determine her solvency at the time of the Risher Loan. Unpaid debts (even large ones) do not always equal insolvency. Since any reasonable investigation would not have uncovered any fraud, this Court should find that ABT was without knowledge of the voidability of the transfer (or at least that there is a question of fact on that point) and deny the Plaintiff's Motion for Summary Judgment.

## <u>CONCLUSION</u>

Based on the foregoing, ABT respectfully requests that this Court deny the Plaintiff's Motion for Summary Judgment.

Respectfully submitted, this 28th day of August 2020.

*/s/Bret J. Chaness*
BRET J. CHANESS (BPR No. 31643)
**RUBIN LUBLIN TN, PLLC**
3145 Avalon Ridge Place, Suite 100
Peachtree Corners, Georgia 30071
(678) 281-2730 (Telephone)
(404) 921-9016 (Facsimile)
bchaness@rlselaw.com

*Attorney for American Bank & Trust of the Cumberlands*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2020, the within and foregoing was filed via CM/ECF, which will serve notice on all parties.

*/s/ Bret J. Chaness*
BRET J. CHANESS (BPR No. 31643)