**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COOKEVILLE DIVISION**

IN RE:

ANGELIA NICHOLE SHOCKLEY,

     Debtor.

Case No. 2:19-bk-00138
Chapter 7
Judge Harrison

JASON BRUBACHER, with derivative standing
on behalf of the bankruptcy estate

     Plaintiff,

v.

AMERICAN BANK & TRUST OF THE
CUMBERLANDS,

     Defendants.

Adversary No. 2:20-ap-90020

## AMERICAN BANK & TRUST'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW, American Bank & Trust of the Cumberlands ("ABT"), Defendant in the

above-styled action, and hereby responds to *Plaintiff's Statement of Undisputed Material Facts*

*and Exhibits in Support of Motion for Summary Judgment* (the "SUMF")[Doc. 19] as follows:

1.     Mr. Brubacher is the former husband of Debtor Angelia Nichole Shockley (the "Debtor").

[Ex. 1, Final Decree of Divorce]. Prior to their divorce in 2016, the two lived together at the real

property located at 2088 Buffalo Valley Road, Cookeville, Tennessee 38501 (the "Property").

[Id.].

     **RESPONSE**: **Admitted**.

1

2.     On May 23, 2016, Mr. Brubacher and the Debtor were divorced pursuant to a Final Decree of the Chancery Court for Putnam County, Tennessee (the "Divorce Decree"), which incorporated the Marital Dissolution Agreement attached thereto (the "MDA") that set forth the respective responsibilities of Mr. Brubacher and the Debtor to one another incident to their divorce. [Id.].

**RESPONSE**:  **Admitted**.

3.     Under the MDA, the parties agreed that any income tax liability in tax year 2015 or thereafter arising from the operation of Lyfe Tea, LLC or JanPact, LLC—certain companies that the Debtor and Mr. Brubacher owned and operated prior to their divorce—would be paid by the Debtor, with the Debtor indemnifying Mr. Brubacher for any liability he incurred as a result of these tax liabilities. [Id.].

**RESPONSE**: **Admitted**.

4.     As of January 10, 2019, the Debtor owed $332,504.60, plus an additional $42,615.12 in interest, for tax year 2015, and $32,560.22, plus an additional $1,236.01 in interest for Tax Year 2017. [Claim No. 2].

**RESPONSE**: **Admitted**.

5.     The Debtor was aware in May 2017 of the liability that she owed to the Internal Revenue Service and to Mr. Brubacher under the MDA as incorporated into the Divorce Decree.

> 12   Q.     So you were aware in May of 2017 that you owed
> 13   the IRS a substantial amount of money and my client a
> 14   substantial amount of money?
> 15   A.     I was aware whenever I divorced I owed both of
> 16   them.

[Ex. 2, A. Shockley 341 Transcript, p. 29].

**RESPONSE:  Denied.  In the above-quoted testimony, when asked if she was aware in May 2017 of the liability that she owed to the IRS and to Mr. Buschbacher, Shockley did**

**not say anything about her knowledge in 2017, but responded only about her knowledge at the time of her divorce in 2016.**

6.      On January 9, 2018, as required by the Divorce Decree, Mr. Brubacher conveyed his interest in the Property to the Debtor. [Ex. 3, Deed from Brubacher to Shockley]. The Property was unencumbered at the time of such transfer.

**RESPONSE: Admitted.**

7.      In January or February of 2018, the Debtor met Randal Risher, and sometime thereafter, the two became romantically involved, eventually becoming engaged in September 2018.

```
                                                      Page 27
    1   Jason Brubacher.  When did you meet Randall Risher?
    2   A.      When did I meet him?
    3   Q.      Uh-huh.
    4   A.      January/February of 2018.
```

[Ex. 2, A. Shockley 341 Transcript, p. 27]

```
                                                      Page 30
    1   Q.      And you were romantically involved with
    2   Randall Risher at the time you transferred the house
    3   to him?
    4   A.      Yes.
    5   Q.      And he gave you nothing in return for the
    6   transfer?
    7   A.      No.
```

[*Id*. at p. 30].

3

```
 4   Q.      Do you own any real property?
 5   A.      Any real property?
 6   Q.      Uh-huh.
 7   A.      Of course, there's the issue with my home that
 8   I had the home and signed it over to my ex-fiance.
 9   Q.      So explain the issue to me.  I'm not familiar.
10   A.      Well, I guess that would be the impetus of
11   filing the bankruptcy was that we were engaged and --
12   Q.      Who is we?  Who is the --
13   A.      Randall Risher.
14   Q.      How do you spell the last name?
15   A.      R-I-S-H-E-R.
16   Q.      Okay.  And when were you engaged?
17   A.      We got engaged I guess it was September.
18   Q.      Of what year?
19   A.      Of 2018.
20   Q.      Okay.
21   A.      August/September, I'm trying to remember.  I
22   could -- would that be good enough right now?
```

[Id. at p. 6].

**RESPONSE: Admitted.**

8.      Sometime in 2018, the Debtor attempted to take out a loan against the Property with U.S.

Bank, but she was denied due to her debt.

```
22   Q.      Okay.  But before you gave it Randall Risher,
23   did you try to take out a loan?
24   A.      Yeah.
25   Q.      Were you denied?
```

```
 1   A.      Yes.
 2   Q.      Why?
 3   A.      Because of, basically, all the debt that I do
 4   have.
 5   Q.      What bank did you apply with?
 6   A.      I applied with US Bank.
 7   Q.      Who did you talk to at US Bank?
 8   A.      I did it online.  Well, and then there was --
 9   he's not there anymore.  What is his name, Mark.
10   Q.      In person?
11   A.      Uh-huh.
12   Q.      At US Bank in Cookeville?
13   A.      Uh-huh.
14   Q.      And you received a denial letter?
15   A.      Yes.
16   Q.      Do you still have that?
17   A.      No.
18   Q.      When do you think that was?
19   A.      Over a year ago.
20   Q.      Within a month of transferring it to Randall
21   Risher?
22   A.      Within a month, no.
23   Q.      Within the same year?
24   A.      Within the same year, yeah.
```

[Id. at pp. 27-28].

**RESPONSE:  Denied.  Shockley testified her loan application was denied "because of, basically, all the debt that I do have." Moreover, ABT objects to this fact because any statement from U.S. Bank about why Shockley was denied for a loan is inadmissible hearsay.**

9.      After being denied this loan, the Debtor and Mr. Risher decided that it would be easier to qualify for a loan if the Property were first transferred to Mr. Risher, who could then apply for a loan. [*Id.* at p. 7].

5

```
 1   when we transferred it over.  But what we were
 2   thinking was that he took out a loan on the property,
 3   but it had to be in his name.
 4   Q.      What was the property?  Tell me more about the
 5   property.
 6   A.      The property is my home, 2088 Buffalo Valley
 7   Road.
 8   Q.      In Cookeville?
 9   A.      Uh-huh.
10   Q.      Okay.  So that was your house, it was in your
11   name?
12   A.      Yes.
13   Q.      Okay.  And Randall Risher took out a loan in
14   his name?
15   A.      Well, so he couldn't take out a loan unless
16   the property was in his name.  And, at that time, he
17   had, you know, convinced me that we were going to take
18   out the loan together, rebuild the business, repay
19   debt, you know, do everything together.  And I was
20   mistaken in trusting that.
21           Anyway, he took out a loan against the house.
22   I signed over the house to him.  He took out a loan
23   against the house.  And now -- he basically gave, how
24   much was it, 60,000 of the loan, maybe, to help out
25   with the business.  And then he -- we broke up.
```

[*Id.* at p. 7].

**RESPONSE:  Admitted.**

10.    To effect this plan, on August 16, 2018, the Debtor conveyed the Property to Mr. Risher

for no consideration. [Ex. 4, Deed from Shockley to Risher; Ex. 2, A. Shockley 341 Transcript, p.

30].

6

```
                                                    Page 30
1  Q.    And you were romantically involved with
2  Randall Risher at the time you transferred the house
3  to him?
4  A.    Yes.
5  Q.    And he gave you nothing in return for the
6  transfer?
7  A.    No.
```

**RESPONSE: Admitted.**

11.     Following the conveyance of the Property to her fiancé, the Debtor continued to live at

the Property. [Doc. No. 1, Voluntary Petition, p. 2].

**RESPONSE: Admitted.**

12.     In or around August 2018, Mr. Risher decided to pursue a loan against the Property with

ABT, with Mr. Risher serving as the borrower. The reason for selecting ABT is that other lenders

required Mr. Risher to have owned the Property for at least six months before issuing a mortgage

thereon, but ABT did not have any such requirement.

```
17  Q.    All right.  And what was the amount of the
18  loan that Randall Risher took out?
19  A.    $170,000.
20  Q.    With what bank?
21  A.    With American Bank & Trust.
22  Q.    American did you say?
23  A.    Yeah.  I believe he took out the loan with
24  them, because it hadn't been the six-month maturity,
25  you know, of transferring the property.  And so they
                                                    Page 9
1   could do the loan.  I guess, is that -- I don't know.
2   Q.    I'm not sure --
3   A.    There's a thing, I guess, that it has to be in
4   somebody's name for six months.
5   Q.    But that bank, the Bank & Trust, didn't have
6   to have that same regulation, the same requirements?
7   A.    No.  I don't know if it's because it's locally
8   owned or what.
```

[Ex. 2, A. Shockley 341 Transcript, pp. 8-9].

7

**RESPONSE: Denied. Shockley's testimony about the reason Risher chose to apply for a loan with ABT is speculative at best.**

13. On September 12, 2018, Mr. Risher submitted a *Loan Application* with ABT. [Ex. 5, the Loan Application].

**RESPONSE: Admitted.**

14. In the Loan Application, Mr. Risher acknowledged he had owned the Property for ".25 years," though in fact he had owned the Property for less than one month at that time [*Id.*; Ex. 4, Deed from Shockley to Risher].

**RESPONSE: Admitted.**

15. The loan officer assigned to Mr. Risher's Loan Application was Trevor Dyer. [Ex. 5, Risher Loan Application].

**RESPONSE: Admitted.**

16. Mr. Dyer is a personal acquaintance of Mr. Risher, having known him since childhood.

```
15   Q.      Okay.  So let's move forward to this
16   particular loan.  Now, did you personally know Randal
17   Risher before November -- or let's say before
18   September of 2018 when he submitted a loan
19   application?
20   A.      I did.
21   Q.      How did you know him?
22   A.      We grew up down the street from each other.  I
23   know his family.  I had not spoken to him in several
24   years, but we had attended church some together and
25   we -- like I said, we grew up, rode the school bus
                                                    Page 15
 1   together.  I knew him for many years, from then until
 2   he moved away from Cookeville.
```

[Ex. 6, Depo. T. Dyer, pp. 14-15].

**RESPONSE: Admitted.**

17.    Sometime after Mr. Risher submitted the Loan Application, he and Mr. Dyer had a conversation about the contemplated loan. In this conversation, Mr. Risher explained to Mr. Dyer that the reason the Debtor transferred the Property to him prior to him pursuing the loan was because the Debtor could not qualify for a loan due to her credit issues resulting from her divorce.

```
 1   Q.       Now, in this application, he'd only owned this
 2   property for a quarter of a year, estimated --
 3   A.       Uh-huh.
 4   Q.       -- that he was seeking to borrow against.  Did
 5   that raise any red flags with you when you received
 6   the application?
 7   A.       It did somewhat, and we talked through it, and
 8   it kind of satisfied what I was -- you know, kind of
 9   any qualms I had with it.
10   Q.       Well, what were your qualms and how were they
11   satisfied?
12   A.       He had just told me that he -- they felt like
13   he would be able to obtain the loan, had a better
14   chance of getting the loan in his name because of her
15   recent divorce, and that was the reason that they put
16   the property in his name, so that he could apply for
17   the loan.
18   Q.       All right.  So did Ms. Shockley attempt to
19   apply for the loan herself first?
20   A.       No, not that I recall.
21   Q.       Okay.  So why would he have a better chance
22   of obtaining the loan than her as a result of her
23   divorce?  I don't understand the link between those.
24   A.       Generally -- and I don't recall the exact
25   conversation, but generally people's credit is
```

```
 1   affected by divorces.  We -- I don't recall getting
 2   into that with him about her.  He just felt like they
 3   would have a better chance.  He did state that she did
 4   go through a divorce and she was paying alimony.  We
 5   didn't really get into the specifics, that I recall.
 6   And their just overall assumption was that he would
 7   stand a better chance of getting the loan.
```

9

[*Id*. at pp. 22-23].

```
 7   Q.      So you were aware, then, at the time he
 8   applied for this loan, his fiancee was Angelia
 9   Shockley?
10   A.      Correct.
11   Q.      Okay.  And she owned the company Lyfe Tea that
12   he'd be working for?
13   A.      That's what he told me, yes.
14   Q.      And she also owned the property that she had
15   given to him to allow easier mortgage qualification,
16   correct?
17   A.      That was my understanding, correct.
```

```
22   Q.      Did this statement, that the ownership of
23   the property changed in August of 2018 from wife to
24   husband for no money -- and that's one month before
25   Mr. Risher applied for this loan -- did that cause you
```

```
                                              Page 38
 1   any concern in the underwriting of this loan?
 2   A.      It did not after I discussed with -- had the
 3   conversation with Randy on the reason for it.
 4   Q.      "It" being that his -- that Angelia, because
 5   of her divorce and credit issues, would not be able to
 6   get the loan so they had to put it in Randy's name so
 7   he could get the loan?
 8   A.      He felt like he stood a better chance of
 9   getting the loan in his name only.
10   Q.      All right.  And that was because of the credit
11   issues that Ms. Shockley was facing resulting from her
12   divorce from Mr. Brubacher, right?
13   A.      I don't recall the exact details of that.
14   Just because of the divorce, he felt like it would be
15   better to be put in his name.
16   Q.      Well, what other reason would there be?
17   A.      I couldn't answer that question.
```

[*Id*. at pp. 37-38].

10

1   questions which won't take too long.

2   Ned had talked to you about the conversation

3   that you had with Mr. Risher concerning why the title

4   was transferred from Ms. Shockley to him.  Do you

5   recall that conversation?

6   A.      Yes.

7   Q.      And you said it was because she was

8   concerned that she wouldn't be able to apply -- that

9   Ms. Shockley was concerned she wouldn't be able to

10  qualify for the loan, correct?

11  A.      That's correct.

12  Q.      Do you recall whether that conversation was in

13  person or over the phone?  How did that take place?

14  A.      With Randy?

15  Q.      Yes.

16  A.      Okay.  I believe it was in person.

17  Q.      Okay.  And was that the entire extent of the

18  conversation, that he was concerned that Ms. Shockley

19  wouldn't be able to apply for the loan, or was there

20  more to it?  I just want to make sure we have the full

21  conversation.

22  A.      I mean, it was just concerns that the results

23  of the divorce would not enable her to obtain the

24  loan.  You know, I think -- from my observation, she

25  just had fears that she wouldn't be able to get the

1   loan, and she wanted it to be in his name, and that

2   was the reason they had -- he applied for it just in

3   his name.

4   Q.      Okay.  And did that raise any red flags on

5   your part?

6   A.      It caused us to discuss it, but nothing --

7   after we spoke, I understood why that was the case.

8   Q.      And when you say it caused "us" to discuss it,

9   do you mean you and Mr. Risher or you and somebody

10  else at the bank?

11  A.      Me and Ryan would have discussed it after the

12  fact, after I spoke with Randy, but the discussions

13  were with Randy in person.

14  Q.      Okay.  And what did you discuss with Ryan

15  after that conversation with Randy?

16  A.      Just the reasoning that the property was put

17  into Randy's name, that they felt like he would be

18  able to get the loan because of her divorce that she'd

19  gone through prior to this loan.

20  Q.      Okay.  And you had mentioned that she owed --

21  that Mr. Risher told you that Ms. Shockley owed

22  Mr. Brubacher alimony, correct?

23  A.      That's correct.

11

[Id. at pp. 54-55].

**RESPONSE: Denied. Dyer did not testify "that the reason the Debtor transferred the Property to him prior to him pursuing the loan was because the Debtor could not qualify for a loan due to her credit issues resulting from a divorce." There is nothing in the deposition testimony that states definitively that the Debtor could not qualify for a loan. Dyer testified only that Risher said that Shockley "just had hears that she wouldn't be able to get the loan, and she wanted it to be in his name, and that was the reason they had – he applied for it just in his name."**

18.     Mr. Dyer knew that the Debtor would continue to reside in the Property following issuance of the loan.

```
 9   Q.      Okay.  Now, just to maybe jump ahead, it was
10   your understanding that Ms. Shockley was also residing
11   in the property, correct?
12   A.      Correct.
13   Q.      So she conveyed the property to Mr. Risher
14   for purposes of obtaining this loan, but she would
15   continue to cohabit that property with him after the
16   loan?
17   A.      Correct.
```

[*Id.* at p. 29].

**RESPONSE: Admitted.**

19.     After Mr. Risher submitted the Loan Application, the Debtor communicated directly with Mr. Dyer related to the loan as follows:

a. On September 5, 2018, the Debtor emailed Mr. Dyer the 2016 and 2017 tax returns for Lyfe Tea, LLC, signing the email "Angelia Brubacher." [Ex. 7, 9.5.18 Shockley Email with ABT].

b. On September 19, 2018, the Debtor emailed Mr. Dyer certain pay stubs of Mr.

12

Risher. [Ex. 8, 9.19.18 Shockley Email with ABT].

c. On October 9, 2018, the Debtor emailed Mr. Dyer proof of Mr. Risher's ongoing child support payments and separately requested an update on the anticipated date of ABT's appraisal of the Property and closing of the loan. [Ex. 9, 10.9.18 Shockley Email with ABT].

**RESPONSE**:  **Admitted**.

20.     On November 8, 2018, Rooker Appraisal Service appraised the Property for ABT as part of ABT's loan underwriting process (the "Appraisal"). [Ex. 10, Appraisal].

**RESPONSE**:  **Admitted**.

21.     According to the Appraisal, the Property was worth $398,700.00. [Id.].

**RESPONSE**: **Admitted**.

22.     The Appraisal specifically acknowledged that the Property had been conveyed to Mr. Risher in August 2018 for no monetary consideration. [Id. at p. 34]. To support this statement, the Appraisal included a copy of the August 16, 2018 deed conveying the Property from the Debtor to Mr. Risher. [Id. at pp. 32-33]. The Appraisal also included a tax record showing that as of November 2018, the most recent property tax payments on the Property were paid by Mr. Brubacher. [Id. at p. 21].

**RESPONSE**: **Admitted**.

23.     After receiving the Appraisal, ABT completed an internal assessment of the Appraisal. [Ex. 11, the Appraisal Assessment]. In the Appraisal Assessment, ABT included a copy of the 2018 property tax records indicating that the owner of the Property as of January 1, 2018 was Jason Brubacher and the Debtor, as husband and wife, with the Debtor as the current owner. [Id. at p. 2].

**RESPONSE**: **Admitted**.

24.     Mr. Dyer personally reviewed both the Appraisal and the Appraisal Assessment when conducting his due diligence on the loan for ABT.

```
17  Q.      Now, do you personally review the appraisal
18  when it's complete, or is that handled by someone else
19  at the bank?
20  A.      We have an appraisal review process, but I do
21  review it as well.
22  Q.      Okay.  Do you recall if you specifically
23  reviewed the appraisal in this particular loan?
24  A.      I would have, yes.
```

[Ex. 6, Depo. T. Dyer, p. 33].

```
18  Q.      Okay.  So did you personally review this
19  appraisal assessment or no?
20  A.      This tax card assessment?
21  Q.      The document that is attached to the
22  appraisal/evaluation review?
23  A.      Yes, I would have looked at it.
```

[*Id*. at p. 41].

**RESPONSE**:  **Admitted**.

25.     Sometime after Mr. Risher submitted the Loan Application, Mr. Dyer prepared a Real Estate Loan Input Worksheet related to ABT's underwriting of the loan (the "Loan Input"). [Ex. 12, the Loan Input].

**RESPONSE**: **Admitted**.

26.     In the Loan Input, Mr. Dyer included a "Summary of Credit History" for Mr. Risher, stating therein, among other things:

a. Mr. Risher is a new customer of ABT.

b. Mr. Dyer has known Mr. Risher for many years.

14

c. Mr. Risher had recently moved back to Cookeville, TN to accept a job with Lyfe Tea, LLC, a company owned by his fiancé, the Debtor.

d. Mr. Risher had credit issues, including (i) a bankruptcy filing; (ii) a vehicle repossession; (iii) unpaid bills as reflected on his credit report; and (iv) child support obligations.

[*Id.* at p. 2].

**RESPONSE: Admitted.**

27.    Notwithstanding these issues, Mr. Dyer recommended that management sign off on final loan approval. [*Id.*].

**RESPONSE: Admitted.**

28.    ABT follows certain policies and procedures related to loan underwriting as set forth in ABT's *Loan Policy Manual* (the "Policy Manual"). [Ex. 13, the Policy Manual].

**RESPONSE: Admitted.**

29.    The Policy Manual provides that, in all cases of loans to be secured by real estate,

It is the policy of this Bank to adhere to lending standards that are consistent with safe and sound banking practices. This real estate lending policy is designed to be ***in compliance with regulatory real estate lending standards***, as well as consistent with the overall scope of the Bank's lending activities.2

[*Id.* at p. 43].

**RESPONSE: Admitted.**

30.    Though ABT applies different underwriting criteria for loans to be sold to Fannie Mae or other Government Sponsored Entities and loans to be held by ABT in portfolio, it applies the same standards in either case to the quality of title to the property to be held as collateral therefor.

```
25   Q.     My question is: Are you aware of any
```

```
                                                        Page 14
 1    difference in -- from the Freddie guidelines versus
 2    the bank's in-house guidelines relating to the quality
 3    of the collateral, the title to the collateral, or is
 4    it your understanding that you use the same analysis
 5    that you would on a Fannie or a Freddie loan as you
 6    would on a portfolio loan in determining whether title
 7    to the collateral you're going to take a mortgage on
 8    is quality?
 9    A.      I would use the same analysis between both.
```

[Ex. 6, Depo. T. Dyer, pp. 13-14].

**RESPONSE: Denied. ABT does not apply Freddie Mac or any other title seasoning standards for in-house/portfolio loans.** *See* **ABT's Statement of Material Facts at ¶ 9.**

31.     ABT does not perform any specific due diligence related to the title of its real estate collateral. Instead, ABT relies on issuance of a title policy. Thus, if a title policy is issued, ABT does not conduct any further diligence into whether its mortgage loan is subject to avoidance under applicable law.

```
15            Now, from your perspective, is the history of
16    ownership of the property relevant for underwriting a
17    loan?
18    A.      It is.
19    Q.      Why?
20    A.      We generally refer to the title search.
21    Basically, what we're looking for is who owns the
22    property.
23    Q.      Okay.  Is length of ownership of the property
24    prior to applying for the loan something that the bank
25    considers when underwriting a loan?
```
```
                                                        Page 35
 1    A.      We typically depend on our third-party title
 2    search companies to provide any information that is a
 3    red flag.
 4    Q.      Well, what kind of information would be a red
 5    flag?
 6    A.      Just that the person -- basically, the person
 7    who is applying for the loan does not own the
 8    property.
```

16

[*Id*. at pp. 34-35].

```
 8   question of Mr. Dyer and I'll ask you:  Does the bank
 9   do any independent investigation into title or does it
10   rely exclusively on the insurance carrier to provide
11   that diligence?
12   A.      We normally rely on the third-party attorney.
13   Q.      Okay.  So if a title company is willing to
14   insure your loan's title -- and by "you" I mean the
15   bank's -- let me speak more clearly.
16           If the bank is contemplating a loan and a
17   title insurance company is willing to write a policy
18   to insure that loan, the bank -- does the bank do any
19   additional diligence to determine the legitimacy of
20   that title, or is it satisfied that as long as it's
21   insured, it doesn't need to do anything further?
22   A.      We're satisfied as long as there's not
23   exceptions to that title policy that are out of the
24   ordinary.
```

[Ex. 14, Depo. R. Smith, p. 10].

```
 5   Q.      And so since this is a covered risk, since
 6   you know -- or the bank knows that if I loan money
 7   to a person and they give me a lien on their property
 8   and that property gets clawed away from them in some
 9   way because it's a fraudulent transfer, I'm insured,
10   does that mean that the bank does not do any
11   diligence, other than obtaining a title policy, to
12   determine that that won't happen or is unlikely to
13   happen?
14           MR. CHANESS:  Object as to form.
15           Go ahead and answer, Ryan.
16           THE WITNESS:  There are no exceptions on
17   a title policy.  Risher was the 100 percent vested
18   owner.  And when we see that and we see no other
19   exceptions, then there was no reason for us to raise
20   further questions, to my knowledge.
```

[*Id*. at p. 13].

**RESPONSE:   Denied.   In the above quoted testimony, Dyer testified that when underwriting a mortgage loan, ABT relies upon a title search reviewed by a third-party attorney.  Specifically, ABT relies on third-party attorneys in preparation of title insurance**

17

policies who review title searches to communicate any issues regarding the titles, including, but not limited to the history of ownership, to ABT in the title policies. Moreover, ABT did ask Risher for the reason why Shockley conveyed the property to him.

32. During its due diligence, ABT made no inquiry as to the assets or liabilities of the Debtor at the time she conveyed the Property to Mr. Risher prior to issuing the Loan and acquiring the ABT Lien. [Ex. 15, ABT Resp. to Interrog. 11].

**RESPONSE: Admitted.**

33. On November 20, 2018, ABT closed on the loan to Mr. Risher. ABT loaned Mr. Risher $175,000.00 (the "Loan"), which was secured by a first position lien on the Property as evidenced by the deed of trust attached to ABT's claim filed in this case (the "ABT Lien"). [Ex. 16, Closing Disclosure; Claim No. 5].

**RESPONSE: Admitted.**

34. On January 10, 2019 (the "Petition Date"), less than two months after ABT acquired the ABT Lien, the Debtor filed this bankruptcy case. [Doc. No. 1].

**RESPONSE: Admitted.**

35. In the Debtor's Statements and Schedules, the Debtor stated under penalty of perjury that as of the Petition Date, she had assets of $10,750.00 and liabilities of $919,671.00, with liabilities of more than $600,000.00 to the Internal Revenue Service and Mr. Brubacher pursuant to the Divorce Decree. [*Id.*].

**RESPONSE: Admitted.**

36. On April 17, 2019, this Court entered the *Order Granting Motion for Derivative Standing to Pursue Avoidance Actions* (the "Derivative Standing Order"). [Doc. No. 25]. In the Derivative Standing Order, the Court granted derivative standing to Mr. Brubacher to pursue, without

limitation, all claims and causes of action that the Debtor's bankruptcy estate may have related to the Property. [*Id.*].

**RESPONSE: Admitted.**

37. On June 6, 2019, Mr. Brubacher, acting derivatively on behalf of the Debtor's bankruptcy estate, filed an adversary proceeding against the Debtor and Mr. Risher, Case No. 2:19- ap-90110 (the "Risher Adversary Proceeding") seeking a declaration that the transfer of the Property from the Debtor to Mr. Risher for no consideration was both actually and constructively fraudulent pursuant to 11 U.S.C. §§ 544, 548, and 550, and Tenn. Code Ann. §§ 66-5-305, 306, and 308. [Doc. No. 27; Risher Adv. Doc. No. 1].

**RESPONSE**: **Admitted**.

38. On January 24, 2020, this Court entered the *Order Granting Default Judgment Against Angelia Nichole Shockley and Randal Risher* (the "Risher Judgment"). [Risher Adv. Doc. No. 23]. In the Risher Default Judgment, this Court (a) entered a monetary judgment against the Debtor and Mr. Risher for $400,000.00, plus pre- and post-judgment interest, and (b) ordered that the title to the Property be divested from Mr. Risher and revested into the Debtor's bankruptcy estate for administration thereby. [*Id.*].

**RESPONSE: Admitted.**

39. On February 13, 2020, Mr. Brubacher filed this action seeking to avoid the ABT Lien or otherwise obtain a judgment for the value of the ABT Lien due to ABT's status as a subsequent transferee of the fraudulently transferred Property without good faith and with knowledge of the fraudulent transfer at the time it acquired the ABT Lien.

**RESPONSE:  Admitted that Brubacher filed this action seeing to avoid the ABT Lien or otherwise obtain a judgment for the value of the ABT Lien due to ABT's status as a**

subsequent transferee of the fraudulently transferred Property alleging that ABT took the ABT Lien without good faith and had knowledge of the fraudulent transfer at the time it acquired the ABT Lien. Denied that ABT was without good faith or had knowledge of the fraudulent transfer at the time it acquired the ABT Lien. As shown in ABT's Response to the Plaintiff's Motion for Summary Judgment, it exercised good faith and did not have knowledge of the voidability of the transfer. Moreover, this purported "fact" by the Plaintiff that ABT lacked good faith and had knowledge of the voidability is an impermissible legal conclusion couched as an undisputed fact.

Respectfully submitted, this 28th day of August 2020.

/s/Bret J. Chaness
BRET J. CHANESS (BPR No. 31643)
RUBIN LUBLIN TN, PLLC
3145 Avalon Ridge Place, Suite 100
Peachtree Corners, Georgia 30071
(678) 281-2730 (Telephone)
(404) 921-9016 (Facsimile)
bchaness@rlselaw.com

*Attorney for American Bank & Trust of the Cumberlands*

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2020, the within and foregoing was filed via CM/ECF, which will serve notice on all parties.

*/s/ Bret J. Chaness*
BRET J. CHANESS (BPR No. 31643)
