# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# COOKEVILLE DIVISION

| | |
|---|---|
| IN RE:<br><br>ANGELIA NICHOLE SHOCKLEY,<br><br>    Debtor. | Case No. 2:19-bk-00138<br>Chapter 7<br>Judge Harrison |
| JASON BRUBACHER, with derivative standing on behalf of the bankruptcy estate<br><br>    Plaintiff,<br><br>v.<br><br>AMERICAN BANK & TRUST OF THE CUMBERLANDS,<br><br>    Defendants. | Adversary No. 2:20-ap-90020 |

**PLAINTIFF'S RESPONSE TO AMERICAN BANK & TRUST OF THE CUMBERLANDS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS FOR MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Jason Brubacher, with derivative standing on behalf of the bankruptcy estate of Debtor Angelia Nichole Shockley ("Mr. Brubacher"), respectfully submits these responses to *American Bank & Trust's Statement of Undisputed Material Facts in Support of its Response in Opposition to Plaintiff's Motion for Summary Judgment* (the "ABT SUMF"). All capitalized terms not specifically defined herein shall have the meaning ascribed to them in the ABT SUMF or in *Plaintiff's Statement of Undisputed Material Facts and Exhibits in Support of Motion for Summary Judgment* (the "Brubacher SUMF"). Mr. Brubacher respectfully states as follows:

1

1. The *Final Decree* (the "Divorce Order") in the divorce of the Plaintiff, Jason Brubacher ("Brubacher" or the "Plaintiff"), and the Debtor, Angelia Nichole Shockley ("Shockley"), which memorialized the *Marital Dissolution Agreement* attached thereto, was entered in Chancery Court for Putnam County, Tennessee Case No. 2016-CV-22 on May 23, 2016, but was not recorded in the real property records of Putman County, Tennessee (the "Real Property Records") until June 19, 2019, at which time it was recorded as Instrument No. 227425. The Divorce Order was silent as to the actual amounts Shockley owed the Plaintiff and the IRS. *Plaintiff's Statement of Undisputed Material Facts and Exhibits in Support of Motion for Summary Judgment* ("Plaintiff's SOMF"), Exh. 1 [Doc. 19-1]. A true and correct copy of the recorded Divorce Order, showing the recording information, is attached hereto as **Exhibit "A"**.

**RESPONSE**: Mr. Brubacher admits that the document attached to the ABT SUMF as Exhibit A is a true and correct copy of the Divorce Order and that such Divorce Order was recorded in the Real Property Records on June 19, 2019 as Instrument No. 227425, and that such document speaks for itself.

2. Trevor Dyer, the loan officer at ABT who took Risher's application for the loan at issue in this lawsuit in August 2018 and who ultimately approved the loan application, determined that Risher's debt-to-income ratio and the loan-to-value contemplated by Risher's loan application supported ABT extending the loan to Risher.

> Q. Okay.· Well, turning back to Exhibit 2, you reference several credit issues that Mr. Risher had had in the past. He went through a divorce, had a bankruptcy, had a voluntary repossession of a vehicle, and he has issues on his credit report, and he has child support arrearages. Did that give you any concern about underwriting a loan to Mr. Risher on this property?
>
> A. It did, yes.
>
> Q. Okay. So what was it that mooted that concern or overcame that concern?

2

> A. His debt-to-income ratio -- scrolling up – I believe it was in the mid 30s, which is within our policy. Our policy goes up to 45 percent. So that was a compensating factor. The loan-to-value on the property was a compensating factor to help offset the credit –

Exh. 6 to Plaintiff's SOMF, Depo. T. Dyer, 26:6-22.

**RESPONSE**: Mr. Brubacher admits that the above language is a quote from Mr. Dyer's deposition transcript. Mr. Brubacher disputes, however, that the above language represents sufficient or objectively reasonable due diligence into ABT's underwriting of the loan at issue in this case given the information provided thereto regarding the legitimacy of the underlying transfer of the Property from Ms. Shockley to Mr. Risher.

3. Throughout Risher's loan application, both Risher and Shockley (a/k/a Angelia Brubacher) communicated with ABT about Risher's application. Shockley sent Dyer tax returns for LyfeTea, LLC, and pay stubs and copies of child support payments for Risher as part of Risher's loan application. Shockley also followed up with Dyer about the status of the loan application. These occurrences were not unusual to ABT.

> Q. Okay. Is it normal for a third-party non-borrower to be sending you this information instead of the borrower himself?
>
> A. Yes.

*Id.* at 29:24-30:2.

> Q. Okay. So now we have an email from Ms. Shockley sending tax returns and an email from Ms. Shockley sending pay stubs. Why wouldn't Mr. Risher be the one to send you these pay stubs?
>
> A. Sometimes that will happen with a loan. Someone will -- you know, a spouse or a significant other will take care of sending documents to us as opposed to the actual person.
>
> Q. Okay. Even if that person sending information is not your borrower?
>
> A. Correct.

*Id.* at 30:17-31:2.

> Q. And I'll just ask the same question again: Is it normal to have a non-borrower sending you information on the borrower's child support obligations to a wholly independent third party?
>
> A. If the borrower -- if the borrower allows that person to do it and has indicated to me that another person would be sending documents to me, then yes, that is -- that is common.

*Id.* at 31:22-32:4.

> Q. Okay. Did it raise any concerns that Ms. Shockley had conveyed this property to Mr. Risher a month before he applied for this loan and that Ms. Shockley appears to be having substantial correspondence with the bank about the loan itself?
>
> A. No, those two items together did not raise a concern because I expected to communicate with her based on --
>
> Q. Why did you expect to communicate with her?
> A. Randy had indicated that he would have her send me items.

*Id.* at 32:16-33:1.

**RESPONSE**: Mr. Brubacher admits that the above language is a quote from Mr. Dyer's deposition transcript. He disputes, however, any inference that because such occurrences were ostensibly not unusual for ABT, that somehow means ABT's loan underwriting was objectively reasonable under the circumstances or otherwise undermines or negates ABT's actual or inquiry notice as to the underlying voidability of Ms. Shockley's transfer of the Property to Mr. Risher for no consideration months before ABT acquired the ABT Lien from Mr. Risher.

4. ABT ordered a title report on the subject property to determine ownership of the property and also to identify any potential title issues.

> A. My understanding, the title analysis is done the same. We have a third party that does the title search for title insurance, and we depend on them to tell us the legality of the ownership of the property on both types of loans.

*Id*. at 13:4-8.

    Q.    Okay. Now, additionally, you'll get a title policy on the property; is that right?

    A.    That's correct.

    Q.    What is the purpose of a title insurance policy?

    A.    To show us who owns the property. It shows any liens against the property. It will show us if there's any taxes owed against the property, and to insure us against any items that do not show up on that title search.

*Id*. at 42:25- 43:9.

    Q.    Okay. And in the title search that you received, did it reveal any liens against Ms. Shockley?

    A.    No, not that I -- no. No, it did not say -- it did not, no.

*Id*. at 56:2-6.

**RESPONSE**: Admitted.

5.     The IRS did not record a loan against Angelia Shockley in the Real Property Records, as evidenced by the fact that the IRS filed a claim in Shockley's bankruptcy case as an unsecured creditor. [Claim Number 2].

    Q.    Okay. And in the title search that you received, did it reveal any liens against Ms. Shockley?

    A.    No, not that I -- no. No, it did not say -- it did not, no.

*Id*. at 56:2-6.

**RESPONSE**: Admitted.

6.     Brubacher did not record a lien against Angelia Shockley in the Real Property Records.

    Q.    Okay. And in the title search that you received, did it reveal any liens against Ms. Shockley?

A. No, not that I -- no. No, it did not say -- it did not, no.

Exh. 6 to Plaintiff's SOMF, Depo. T. Dyer, 56:2-6.

**RESPONSE**: Admitted.

7. The extent of ABT's diligence with respect to investigating the reason Shockley conveyed the Property to Risher was a discussion between ABT loan officer, Trevor Dyer, and Risher.

> Q. Okay. And when you brought up this – when you told Ryan about the reasoning for the transfer of the property, did he ask you to get any more information or were you-all satisfied with his reasoning?
>
> A. I believe we were satisfied with that reasoning.

Exh. 6 to Plaintiff's SOMF, Depo. T. Dyer, 56:7-13;

> Q. Okay. And I believe Mr. Dyer did testify, and you heard him testify, that he did that diligence by having a discussion with Mr. Risher, and he was satisfied with that explanation; is that right?
>
> A. Yes.

A true and correct copy of the complete transcript of Ryan Smith's deposition (the "Depo. R. Smith") taken in this case is attached hereto as **Exhibit "B".** Depo. R. Smith, 32:1-5.

**RESPONSE**: Admitted for purposes of summary judgment.

8. It is very common for a family member to deed a piece of property to another family member.

> A. It's very common for a family member to deed a piece of property to another family member. That happens often.

*Id*. at 19:25-20:2.

**RESPONSE**: Admitted for purposes of summary judgment but disputed that such conveyance obviates the need for any further due diligence on behalf of a lender to investigate the

6

Case 2:20-ap-90020   Doc 29   Filed 09/21/20   Entered 09/21/20 14:08:29   Desc Main
Document    Page 6 of 10

circumstances governing the underlying transfer prior to taking a lien on the transferred property. For example, Section 4301.5 of Freddie Mac's lending guidelines provide that, in the case of a cash-out refinance (which was the type of transaction secured by the ABT Lien), the borrower must have held title to the subject property for at least six months prior to the date of the loan, unless at least one borrower *inherited* or was *legally awarded* the subject property, or that, among other requirements, there is no affiliation or relationship between the buyer and seller of the purchase transaction.

9. Based on the information obtained by Mr. Dyer during the loan application process, he did not suspect that Mr. Risher obtained the Property through a fraudulent transfer. *See* Exh. 6 to Plaintiff's SOMF, Depo. T. Dyer, 46:17-25, 47:1-23.

**RESPONSE:** Mr. Brubacher admits that Mr. Dyer testified that he did not suspect that Mr. Risher obtained the Property through a fraudulent transfer, but Mr. Brubacher disputes that such lack of suspicion is objectively reasonable. Mr. Dyer was presented with ample information during loan underwriting to reasonably conclude that Mr. Risher obtained the Property through a fraudulent transfer such that the ABT Lien would be avoidable as a subsequent transfer of a fraudulently transferred asset. Mr. Brubacher refers to the Brubacher SUMF as establishing this information.

10. ABT does not have a title seasoning policy, which is a policy in which lenders require borrowers to own real property for a certain period of time before extending in-house/portfolio mortgages secured by the real property.

Q. And what's your understanding of the concept of title seasoning?

A. That a person would need to own the property for a certain amount of time. If you're talking about Fannie, I believe Trevor quoted it as six months.

Q. And that's a standard you'd follow in all Fannie loans that you write, correct?

7

A. Yes.

Q. Assuming that an exception -- there's certain limited exception to that rule, of course.

A. Yes.

Q. And assuming those didn't apply, you would follow those rules?

A. Yes.

Q. But do you not follow those guidelines in portfolio loans?

A. Not -- we don't have a policy to that effect.

*Id*. at 19:17-19.

**RESPONSE**: Admitted for purposes of summary judgment.

11. During Risher's loan application, Dyer questioned Risher concerning the facts that Shockley conveyed the Property to him for no consideration soon before he applied for the loan, and Dyer was satisfied with Risher's explanation that he felt like he had a better chance of getting the loan in his name because of her recent divorce.

> Q. Now, in this application, he'd only owned this property for a quarter of a year, estimated --
>
> A. Uh-huh.
>
> Q. -- that he was seeking to borrow against.· Did that raise any red flags with you when you received the application?
>
> A. It did somewhat, and we talked through it, and it kind of satisfied what I was -- you know, kind of any qualms I had with it.
>
> Q. Well, what were your qualms and how were they satisfied?
>
> A. He had just told me that he -- they felt like he would be able to obtain the loan, had a better chance of getting the loan in his name because of her recent divorce, and that was the reason that they put the property in his name, so that he could apply for the loan.

Exh. 6 to Plaintiff's SOMF, Depo. T. Dyer, 22:1-17.

**RESPONSE**: Admitted for purposes of summary judgment.

12. The main investigative avenue that exists to ABT is to communicate directly with the potential borrower, unless the borrower gives permission for ABT to speak to someone else regarding the loan application.

> Q. Does the bank have certain privacy guidelines regarding who to speak to when a loan is applied for?
>
> A. Yes.
>
> Q. And what do those call for?
>
> A. For privacy reasons, we're allowed to discuss only with the borrower unless they give us permission to speak with someone else.
>
> Q. And did you have permission to speak with Ms. Shockley?
>
> A. I did.
>
> Q. Okay. Did you have permission to speak with anybody else about this loan?
>
> A. No.

*Id.*, at 56:18- 57:5.

**RESPONSE**: Mr. Brubacher admits for purposes of summary judgment that *to ABT* the main investigative avenue that exists is to communicate directly with the potential borrower, but he disputes that this limited investigative avenue is objectively reasonable when presented with the sort of information ABT had prior to acquiring the ABT Lien, or that this somehow prevented ABT from inquiring further with Mr. Risher or Ms. Shockley (as Mr. Dyer admits to being authorized to speak with) as to the circumstances surrounding the underlying transfer of the Property prior to acquiring the ABT Lien.

Respectfully submitted,

*/s/ Ned Hildebrand*
HENRY E. ("Ned") HILDEBRAND, IV
GRAY WALDRON
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, TN 37212
615.933.5851
ned@dhnashville.com
gray@dhnashville.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically on September 21, 2020. A copy of the same was served via email through the Court's CM/ECF system on all parties entitled to service thereby.

/s/ Ned Hildebrand
Henry E. ("Ned") Hildebrand, IV